Philadelphia Suburban Water Company, Petitioner *v.* Pennsylvania Public Utility Commission, Respondent. Office of Consumer Advocate, Intervenor.

Argued February 4, 1981, before President Judge
CRUMLISH and Judges WILKINSON, JR., BLATT, MAC-
PHAIL, WILLIAMS, JR. and PALLADINO. Judges MENCER,
ROGERS and CRAIG did not participate.

*Alan L. Reed,* with him *Thomas P. Gadsden,
Morgan, Lewis & Bockius,* for petitioner.

*John A. Levin,* with him *Gilbert L. Hamberg,*
Assistant Counsel, *Steven A. McClaren,* Deputy Chief
Counsel, and *Joseph J. Malatesta, Jr.,* Chief Counsel,
for respondent.

*Philip McClelland,* Assistant Consumer Advocate,
with him *Walter W. Cohen,* Consumer Advocate, for
intervenor.

OPINION BY PRESIDENT JUDGE CRUMLISH, April 6,
1981:

Philadelphia Suburban Water Company (PSWC), a
regulated Pennsylvania Public Utility and wholly
owned subsidiary of Philadelphia Suburban Corpora-

tion (Parent), filed suit in this Court asking us to set aside an order of the Pennsylvania Public Utility commission entered on February 1, 1980, disallowing $2,794,314 of a requested $4,124,940 increase designed to produce annual operating revenues of $36,757,992 for water services. Included in that disallowance is the gain realized from the disposition of two parcels of watershed property. We reverse and remand.

In the late 1920's, PSWC began the planning and later construction of the Geist Reservoir in Delaware County. The two parcels of land here in question were part of the watershed area of the reservoir,[1] and subsequently were included in rate base calculations which provided a return to shareholders. However, after a determination by PSWC's management that the parcels were no longer needed to provide service,[2] PSWC's Board of Directors declared a property dividend of the parcels and subsequently conveyed them by deed to the parent company.[3]

In this case of first impression, we are asked to determine whether the gain received from the sale of non-depreciable watershed property deemed to be no longer used or useful in providing utility service should inure to the benefit of the ratepayer or the shareholder. In essence, we must determine whether

---

[1] The first parcel consisted of 74.5 acres with an original cost of $38,798; the second parcel consisted of 32.8 acres with an original cost of $35,085.

[2] Because of advances in the treatment of sewage, the treatment of water and stricter environmental laws, there is apparently less need now for a utility's extensive watershed holdings than when the land was acquired. There is no indication in either the record or the briefs that PSWC needed either to maintain these parcels of land in the rate base, or that they had been purchased for land speculation.

[3] Because each parcel of land did not have an original cost in excess of $50,000, PSWC did not have to apply to the PUC for approval of the conveyance. *See* 66 Pa. C. S. §1102(a)(3).

the $847,500 difference between the appraised value and the original cost and transfer costs,[4] should be considered utility income or earned surplus for rate-making purposes. If the gain realized by PSWC's conveyance to its parent is placed "above the line" into utility income, then revenues will be increased and the rate payer will benefit from the corresponding reduced rates. Alternatively, if placed "below the line" into the utility's earned surplus, the gain will be used to either pay dividends to shareholders or invest in additional assets. Although placing these gains "below the line" will not reduce revenue requirements for ratepayers, we must conclude that the benefit, if any, would belong to the utility's shareholders.

The Commission maintains that PSWC's total operating revenue requirements have fairly and properly been determined. By adding $84,700 to PSWC's annual revenues for ten years, the Commission did not dispute that the gain on this transaction belonged to the shareholders. Rather, the Commission sought to treat the gain on the distribution of property no differently than either the utility's actual claimed losses or conceptually speaking, proposed extraordinary losses. Within these parameters, the Commission classified the gain derived from the sale of the two parcels as "extraordinary" and ordered PSWC to pass the effects of such extraordinary gains on to the ratepayers.

---

[4] 
| | | |
|---|---|---|
| Appraised property value | $935,000 | |
| Transfer costs | (13,000) | |
| Net appraised value | 922,000 | |
| Original cost of property | 74,500 | |
| Gain on transfer | | $847,500 |
| Annual amortization rate | 10% | |
| Annual amortization (approx.) | | 84,700 |

Commission's order, p. 25.

In opposition, PSWC attacks the Commission's proposed distinction between the legal ownership of gain and its treatment for rate-making purposes as without any substantive meaning. PSWC maintains that the gain from the sale of the non-depreciable asset, watershed land, now out of the rate base should inure to the shareholder. PSWC's basic argument, however, is that by adjusting operating revenues by the net amount of the property dividend (gain or transfer) the Commission has confiscated PSWC property without due process and without just compensation. We agree with the utility that the gain from the conveyance of the two parcels of land inures to the benefit of PSWC's shareholder, and the reduction of its operating revenues by the amortized amount of that gain is unlawful.

First, it must be remembered that we are here dealing with two parcels of land, a non-depreciable asset, no longer in the rate base of the utility. They have been conveyed to the parent company in a property dividend transaction. Those parcels of land had been purchased by PSWC some 50 years before, not by the power of eminent domain but as a normal real estate transaction, and there is no indication the parcels were bought below their market value. They have been taken out of rate base because, as a result of modern purification and sewage techniques, they are no longer needed for watershed purposes.[5]

In *Board of Public Commissioners v. New York Telephone Co.*, 271 U.S. 23 (1926), the United States Supreme Court held that ratepayers pay only for the use of utility assets properly used to provide public service, while the ownership of utility assets resides in the shareholders of the company. The Court stated:

---

[5] The PUC in its brief at page 10, contends the purpose of the transaction was to pay a dividend to the parent.

> Customers pay for service, not for the property used to render it.... By paying bills for service they do not acquire any interest, legal or equitable in the property used for their convenience or in the funds of the company.

*Id.* at 32.

In this regard, the Commission's order not only recognizes that the "funds representing the gain on this transaction belong to the shareholder" but that the shareholders would be the recipient of any benefit upon a liquidation of the PSWC entity. The Commission stated further that it was not requiring PSWC to distribute the gain from the watershed parcels to the ratepayer but only devising a "ratemaking treatment which differs from the legal ownership of these funds" and for that rate-making treatment the gain will be amortized to reduce the revenue requirment of the utility. For the Commission to proclaim that this is not a distribution of funds to the ratepayer is a matter of mere semantics. We see no difference between reducing the total amount of revenue by $847,500 or simply giving the ratepayers the same amount. The effect upon the utility and its parent corporation is identical.

Important here is the premise that land is a non-depreciable asset carried at its original cost by a utility in its rate base. As such, the utility gains no advantage as it does from depreciable assets for the non-cash expense of depreciation. Land is neither consumed nor made useless by its use in utility service. By way of analogy, it is much the same as a catalyst in a chemical reaction, necessary but not consumed by the event. The ratepayer, though bearing the cost of taxes, pays only for the use of land, but gains no equitable or legal rights therein. As the ratepayer would not pay

the loss on any sale of land, neither should he receive the gain.[6]

While this is a case of first impression in Pennsylvania, the issue has been addressed in a number of cases in other jurisdictions. In *Boise Water Corp. v. Idaho Public Utilities Commission*, 99 Idaho 158, 578 P.2d 1089 (1978), the Idaho Supreme Court ruled that the class of persons who receive the benefit of a property transfer are those who bore the financial burden and risks of that property. The Court stated further that because "ratepayers do not pay depreciation on [land] ... the customers are not treated as equitable owners of that property. And not having paid the cost of purchasing nondepreciable property, ratepayers are not entitled to reap the rewards or losses on its sale or other transfer." *Id.* at , 578 P.2d at 1093.

In *City of Lexington v. Lexington Water Co.*, 458 S.W.2d 778, 779 (Ky. 1970), the Kentucky Court of Appeals, faced this same land sale gain issue:

> Having contributed nothing to its acquisition and having acquired no interest therein, the ratepayers assumed no risk in its disposition whether it be profit or loss. The statement ... of the Commission that future ratepayers should be compelled to reimburse the company if such property had been sold at a loss borders on the ridiculous. Having assumed no risk in the loss on the sale of the property of the company, conversely the ratepayers acquired no claim to the profits therefrom.

The Court also noted that:

> Profit made from the sale of nondepreciable land no longer used in serving customers is not

---

[6] The PUC in its brief at page 32, states "there is no risk of loss on the sale of land. Land only appreciates in value." Such a myopic view of the market system and the realities of life does little to further PUC's position of loss versus gain.

an ingredient to be considered in fixing rates. The customers had no interest in the profit realized on the sale — it belonged to the stockholder.

On the other hand, the Commission cites *Democratic Central Committee of the District of Columbia v. Washington Metropolitan Area Transit Commission* (Democratic Central Committee), 485 F.2d 786 (D.C. Cir. 1973), *cert. denied*, 415 U.S. 935 (1974), in favor of the allowance of land sale gains as utility income. Here, the transit utility acquired a transit system pursuant to an act of Congress at a cost $10 million less than the original cost. In addition, ratepayers paid for the acquisition of capital assets, a function usually performed by shareholders. Absent any regulatory accounting rule, at the time of the sale, the D. C. Court was forced to rely upon equity to prevent the shareholders from realizing an unwarranted windfall.

Such, however, is not the case here. The capital necessary to purchase the two parcels of land was provided by shareholders, and there was at the time of the sale a rational rule of accounting in effect. The Commission and the intervenor Office of Consumer Advocate ask us to ignore the Pennsylvania Uniform System of Accounts method of dealing with retired land. The Commission would have us hold that appreciation in the sale or transfer of land should inure to the benefit of the ratepayer and that accounting procedures do not dictate rate-making policy. Commenting here only on the latter assertion, we are guided by the Pennsylvania Uniform System of Account, which provides:

E. Land Retired. The book cost of land retired shall be credited to the appropriate land account. If the land is sold, the difference between the book cost (less any reserve therefor

which has been authorized and provided) and the sale price of the land (less commissions and other expenses of making the sale) shall be credited to Account 401, Miscellaneous Credits to Surplus, or debited to Account 414, Miscellaneous Debits to Surplus, as appropriate. If the land is not used in water service but is retained by the utility, the book cost shall be charged to Account 100-4, Utility Plant Held for Future Use, or Account 110, Other Physical Property, as appropriate.

(Instructions — Utility Plant Account, 9.E)

Our interpretation of this provision leads us to the conclusion that the net gain (or loss) from a land sale transaction is credited (or debited) "below the line" to a shareholder surplus account. In *Democratic Central Committee* case, *supra,* the facts disclose that the District of Columbia's Public Utility Commission had no rule dealing with the gain associated with the sale of appreciated land. The District Court found that for the Commission to adhere to any accounting policy regarding the disposition of these gains, there must be a rational regulation promulgated by the agency. There was none. As a result, the Court was forced to adopt a rational rule of accounting to accommodate "equitable principles." *Democratic Central Committee, supra* at 821. Because of the unusual circumstances surrounding *Democratic Central Committee,* the Court found that by:

[M]easuring the equities of the situation by relevant doctrinal considerations, it is plain that Transit's busriders have shouldered a very significant financial onus, with respect to those lands and that Transit's investors have benefitted uniquely in their ownership of them, and that a reasonable and fair allocation of their appreciation of market value accords that gain

to the farepayers. Unlike situations wherein the basis for profitsharing by farepayers may consist solely in the loss-risk factors associated with depreciable property and the burden of contributions to depreciation reserves — considerations largely or entirely absent in instances of nondepreciable property — farepayers' equities founded upon their assumption of the remaining economic responsibilities — including those occasional by a costly conversion program — and upon investors' enjoyment of especially-conferred advantages not generally available to others, are precisely the same whether the source of the gain is depreciable or nondepreciable property. We hold that a farepayers' claim so predicated must be recognized and effectuated whether the property be of the one character or the other.

... Transit acquired all of its landholdings at a tremendous bargain when it assumed Capital's franchise, and enjoyed valuable special benefits for them in the years which followed. In none of these benefits did the farepayers share, although they had been charged with the major economic responsibilities stemming from Transit's takeover of its predecessor's operations. Given these circumstances, we would be loath to say that the riders are not equitably entitled to the value appreciations on these properties as well.

*Democratic Central Committee, supra* at 822.

We are certainly not faced with the lack of a reasonable accounting rule. The PUC's departure from its rational accounting rule for rate-making purposes has not been justified nor explained. Therefore, we reverse that portion of the PUC's order of February 1, 1980, eliminating $847,500 from its annual revenue re-

quirement as amortized over a 10-year period, and remand this case to the Commission for entry of an order permitting $847,500 in additional revenues from February 1, 1980.

ORDER

The Pennsylvania Public Utility Commission order dated February 1, 1980 at Docket No. 79040824 is reversed insofar as the treatment of gain attributable to the conveyance of retired watershed land, and the record in this proceeding is remanded to the Public Utility Commission for the entry of an order allowing additional revenues from February 1, 1980, consistent with this opinion.

Judge WILKINSON, JR., concurs in the result only.

This decision was reached prior to the expiration of the term of Judge WILKINSON, JR.