Pennsylvania Gas and Water Company, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Walter W. Cohen, Consumer Advocate, Intervenor.

Walter W. Cohen, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent. Pennsylvania Gas and Water Company, Intervenor.

Argued November 16, 1982, before President Judge CRUMLISH, JR. and Judges ROGERS, BLATT, WILLIAMS, JR. and MACPHAIL.

*D. Mark Thomas,* with him *Charles E. Thomas* and *Patricia Armstrong, Thomas & Thomas,* for Pennsylvania Gas and Water Company.

*Frank B. Wilmarth,* with him *Steven A. McClaren* and *Joseph J. Malatesta, Jr.,* for Pennsylvania Public Utility Commission.

*Daniel Clearfield,* Assistant Consumer Advocate, with him *Norman James Kennard,* Assistant Consumer Advocate, and *Walter W. Cohen,* Consumer Advocate, for Walter W. Cohen, Consumer Advocate.

OPINION BY JUDGE ROGERS, February 28, 1983:

A number of issues are presented by these consolidated cross appeals from an order of the Pennsylvania Public Utility Commission (Commission), entered April 24, 1981, and authorizing the Pennsylvania Gas and Water Company (PG&W) to file tariffs or tariff supplements designed to produce annual operating revenues, exclusive of revenue to be derived from the State Tax Adjustment Surcharge, not in excess of $22,122,681—representing an increase in

allowed revenues of $2,307,272. We will begin with the most weighty of these issues: whether the Commission may lawfully embrace depreciated original cost as the sole measure of the value of a regulated utility's property for ratemaking purposes when the proffered justification for such a measure of value lies not in particular evidence adduced in the rate case *sub judice* but in a statement of general principle, recently adopted, that all measures of value in excess of depreciated original cost are unsuitable and are unreasonably advantageous to the utility's shareholders. Some general remarks are necessary.

## I. RATE BASE

### A. "FAIR VALUE" VS. "ORIGINAL COST"

The process of fixing the rates of a regulated utility may be described most generally as the computation by the regulator of the utility's allowed return; an amount (disregarding for the moment the utility's operating expense) of annual revenue arrived at by the application of a "rate of return" to a "rate base." The rate of return is usually expressed as a percentage and is intended to reflect

> a return on the value of the [utility's] property which it employs for the convenience of the public equal to that generally being made at the same time and in the same general part of the country on investments in other business undertakings which are attended by corresponding risks and uncertainties. . . .

*Bluefield Waterworks & Improvement Co. v. Public Service Commission of West Virginia*, 262 U.S. 679, 692-693 (1923). The rate base, the computation of which by the Commission is here challenged, is the amount of the utility's property used and useful, at

the time of the rate inquiry, in rendering the public service. I A. Priest, Principles of Public Utility Regulation 139 (1969).

A dichotomy exists among the American jurisdictions in the fundamental premises employed to ascribe a value to a utility's rate base. A number of states, by statute or by judicial decision where the regulatory enactment is silent on the point, equate the value of a utility's property with the depreciated original cost figure computed for accounting purposes and registered in the company's books of account. No adjustment is made to the historical cost of assets to reflect changes in technology or in the purchasing power of the dollar. Other states, a minority in number[1] attempt in a more or less systematic fashion through the use of ''trended costs'' predicated on accepted inflationary indices, and estimates of cost of plant replacement and reproduction, to recognize

---

[1] In 1969 Professor Priest's nose count yielded the following: The "fair value" jurisdictions, or at least those which depart in some measure from stark "original cost," include Alaska, Alabama, Arizona, Delaware, Illinois, Indiana, Iowa, Maryland, Minnesota, Missouri, Montana, Nebraska, New Jersey, New York, North Carolina, Ohio, Oklahoma, Pennsylvania and Texas. The total is twenty and the states listed are, in the aggregate, probably more significant commercially than their original cost sisters. [Federal Power Commission v.] Hope Natural Gas [320 U.S. 591 (1944)] strongly influenced, but did not decide, the struggle between the two concepts.

I A. Priest, Principles of Public Utility Regulation 166 (1969). See also J. Bonbright, Principles of Public Utility Rates, 190 (1961) placing at 29 the number of states in the original cost camp. Since Hope Natural Gas, of course, the Federal Power Commission has accepted the original cost paradigm.

Evidently, few recent conversions, with the possible exception of Ohio, have taken place. See American Bar Association Annual Report of Section on Public Utility Law 100 (1976).

changes over time in the value of capital invested in the public enterprise.

This ongoing debate as to the appropriate means of rate base valuation has been described as "the most widely disputed legal issue in the history of American public utility regulation" and reflects a lack of consensus as to the very nature of the inquiry —Is the fair return to which a utility owner is entitled to be measured with respect to his investment or with respect to the value of his property?

In *Smyth v. Ames*, 169 U.S. 466 (1898) the Supreme Court rejected the Union Pacific Railroad's contention that it was entitled to exact customer charges sufficient to meet the interest accruing on its securities and held that considerations of constitutional import, including the Due Process clauses of the Fifth and Fourteenth Amendments and the attendant proscription against uncompensated takings of property by the state, required only that a utility be permitted to earn a fair return on the fair value of its property at the time of the rate inquiry. In arriving at the fair value, such factors as original cost of construction, current value, estimated cost of replacement or reproduction, market value of outstanding securities, and the probable earning capacity of the property were to be considered. It should be noted that the inclusion by the Court of measures of current or reproduction value in the formula represented a defeat for the railroad utility which had argued in that era of rapidly falling prices, for the exclusive use of original cost.[2] Thus, the Court rejected the

---

2 William Jennings Bryant argued for appellants against an original cost measure as unreasonably advantageous to the utility:

The ordinary businessman cannot . . . protect himself from falling prices. If his property rises in value, he profits

contention that utility owners were entitled to a fair return on their investment and concluded that, instead, a fair return on the value of the utility's useful property was required. This operative "first principle" necessitating the recognition of changes in value over time was also stated by Mr. Justice HUGHES in the *Minnesota Rate Cases*, 230 U.S. 352, 454 (1913):

> [T]he making of a just return for the use of property involves the recognition of its fair value if it be more than its costs. The property is held in private ownership and it is that property, and not the original cost of it, of which the owner may not be deprived without due process of law.

A different conceptual foundation was proposed by Mr. Justice BRANDEIS[3] in a dissenting opinion in *Missouri ex rel. Southwestern Bell Tel. Co. v. Public Service Commission*, 262 U.S. 276, 289 (1923):

> The thing devoted by the investor to the public use is not specific property, tangible or intangible, but capital embarked in the enterprise.

*Id.* at 290. The Constitution, by this view, guarantees a fair return not on the changing value of utility property but on the amount of the owner's investment —an amount equal to and identified with the property's depreciated original or historical cost. Thus, a decline in the value of property resulting from

---

thereby; so do the owners of a railroad under similar conditions. If his property falls in value, he loses thereby; so must the owners of railroad under similar condition. . . .

*Id.* at 489-90.

[3] Mr. Justice HOLMES joining.

technological innovation as well as an increase in value brought on by, for example, resource scarcity were to be disregarded. However, Mr. Justice BRANDEIS explicitly recognized that systematic and long-lived changes in prices generally, reflecting persistent inflation in and, therefore, diminution of the value of the dollar would undermine the usefulness of an original cost rate base measure. The possibility of significant persistent inflation was considered to be very unlikely. *Id.* at 303 n. 16 (dissenting opinion by BRANDEIS, J.).

In *Federal Power Commission v. Hope Natural Gas Co.*, 320 U.S. 591 (1944) the "prudent investment" or "original cost" paradigm carried the day for the purposes of Constitutional analysis. The issue before the Court was whether the Federal Power Commission had properly valued a producing gas field at the cost to the utility of developing the field. Mr. Justice DOUGLAS later described the holding in *Hope* as follows:

> We [there] held . . . that the Commission was not bound to the use of any single formula in determining rates. And in the [*Hope Natural Gas*] case we sustained a rate order based on actual legitimate cost against an insistent claim that the producing properties should be given a valuation which reflected the market price of the gas.

*Colorado Interstate Gas Co. v. Federal Power Commission*, 324 U.S. 581, 605 (1945). The line is now clearly drawn. The quantity upon which the utility owner is entitled to a fair return is either the prudent initial cost of his investment or the fair value of the property into which that investment has been converted. For the purposes of Constitutional analysis, the former measure is sufficient.

### B.   Current State of the Debate

As we have indicated, the response to *Hope Natural Gas* has been generally favorable but has fallen well short of unanimous acceptance.   Proponents of the use of depreciated original cost argue that such a measure has advantages of administrative efficiency and certainty over the inherently more speculative and hypothetical measures of trended cost or reproduction or replacement value.   In addition, it is noted that *Hope* establishes a utility's Constitutional right to no more (and no less) than a fair return on depreciated original cost.   Finally, a conceptual or philosophical objection to the use of some measures of current value for ratemaking purposes is frequently expressed.   Briefly, it is argued that the use of market value or capitalized earnings as a measure of the value of utility property would be inherently circular inasmuch as such measures are inextricably linked to and even determined by the allowed revenues—the calculation of which is the object of the inquiry.

> [F]air value is the end product of the process of ratemaking not the starting point . . . . the heart of the matter is that rates cannot be made to depend on ''fair value'' when the value of the going enterprise depends on earnings under whatever rates may be anticipated.

*Hope Natural Gas,* 320 U.S. at 601.

This objection loses much of its force when, as is the current practice, original cost values trended with reference to standard indices are used to evidence current value and when, as is also largely the rule today in fair value jurisdictions, measures of current value are only partially recognized as but one of many factors including unadjusted measures of historical cost.

Critics of the prudent investment or original cost conception today argue primarily that nearly forty years of unremitting inflation have undermined the economic assumptions upon which the conception is based. State regulators are clearly free, it is noted, to exceed the Constitutional compensatory minimum and ought now to do so by recognizing systematic changes in the value of property in order to maintain the financial integrity and viability of the public enterprises. Furthermore, it is argued that the concept of fair value as it has developed gives only partial and incomplete recognition to current value and, therefore, provides needed regulatory flexibility to respond to volatile rates of inflation. Professor Priest expresses his considered opinion as to the necessary eventual resolution of the debate in these terms:

> The fair value principle will live . . . and either Congress or the Supreme Court will recognize [it], almost perforce, if the inflation spiral continues toward the zenith. That process of recognition will accelerate as it is discovered that an industry whose prices are determined on the basis of original cost accounting cannot attract on reasonable terms the equity capital required for extensions and additions. And prolonged delay could have a seriously adverse effect on the public interest.

II A. Priest, Principles of Public Utility Regulation, Page 505 (1969).

Another commentator, after establishing the basis for his assertion that "[u]tilities, like other concerns whose capital is chiefly composed of fixed facilities, have experienced [an] increase in construction costs substantially in excess of the increase in price levels

for goods in general," makes a case for the use of a fair market value measure as follows:

> While valuation is a matter of consideration for debtholders, especially when they consider the impact of inflation on the ability of the utility to replace assets as they wear out, it is the equity investor who is most concerned that regulatory policies bear some relation to economic reality. If the equity investor sees inflation steadily eroding the real earning potential of his investment, as he inevitably will under an original cost valuation, he must regard the utility as having a substantial degree of risk not present in similar enterprises having freedom to change their prices to reflect changing price levels.

R. Webb, "Utility Base Valuation in an Inflationary Economy," 28 Baylor Law Review 823, 857-858 (1976).

Even Professor Bonbright, the leading proponent of the original cost paradigm, concedes that persistent inflation must be duly recognized by the regulators. While Professor Bonbright prefers this recognition to take place within the context of the rate of return inquiry he states the concern as follows:

> Even today, however, the so-called "fair-value" rule of ratemaking has not yet suffered its oft-anticipated complete demise. Indeed, in several jurisdictions it has been restored to some measure of its earlier vigor by action of a commission, a court, or a legislature. But one would be naive in assuming that the partial restoration has been based on any conversion of influential political interests to a reproduction-cost or present-value theory of ratemaking as distinct from an actual-cost theory. Almost certainly, the revival of the fair-value

doctrine has been based on another consideration: Namely, on the failure of the actual-cost standard in its traditional version, to make any direct allowance for the serious, continuing price inflation.

J. Bonbright, Principles of Public Utility Rates, 190 (1961).

Finally, several proponents of the fair value rule have touted the rule's indeterminacy as a virtue. For example, in Garfield and Lovejoy, Public Utility Economics 65 (1964) the authors write:

> As we have seen, neither the actual cost nor reproduction cost methods are perfect. The strength of the fair value approach is that it lies somewhere between the lowest and highest possible valuations. It represents a determination based on judgment. The Commissions using the fair value approach are mediating between diverse interests in a manner consistent with the way we resolve other issues in a democratic society.

### C. WHERE DOES PENNSYLVANIA STAND?

We have described the original cost vs. fair value debate in some detail not because we entertain any illusions as to our competence now to finally resolve the attendant economic issues in all their intractable complexity. Our purpose is merely to underscore the present fact of the dichotomy and to summarily explore the clear differences between the two positions. The existence of the dichotomy requires emphasis precisely because the order of the Commission here subject to review seeks to deny that difference. Before we turn to the Commission's order in this case, it is necessary to examine on what side of the cost vs. value conceptual fence the Commonwealth of Pennsylvania has traditionally stood.

Until very recently resolution of the question just posed would not have been difficult. Judicial and scholarly pronouncements on the subject have universally labelled Pennsylvania as an adherent of the fair-value ratemaking methodology. *Scranton v. Scranton Steam Heat*, 405 Pa. 397, 176 A.2d 86 (1962); *Shirk v. Lancaster City*, 313 Pa. 158, 170-171, 169 A. 557, 560 (1933); *City of Erie v. Public Service Commission*, 278 Pa. 512, 123 A. 471 (1924); *Ben Avon Borough v. Ohio Valley Water Co.*, 271 Pa. 346, 114 A. 369 (1921); *Pittsburgh v. Pennsylvania Public Utility Commission*, 187 Pa. Superior Ct. 341, 144 A.2d 648 (1958); *Riverton Consolidated Water Co. v. Pennsylvania Public Utility Commission*, 186 Pa. Superior Ct. 1, 140 A.2d 114 (1958); *Pittsburgh v. Pennsylvania Public Utility Commission*, 182 Pa. Superior Ct. 551, 128 A.2d 372 (1956); *Peoples Natural Gas Co. v. Pennsylvania Public Utility Commission*, 153 Pa. Superior Ct. 475, 34 A.2d 375 (1944); *Solar Electric Co. v. Pennsylvania Public Utility Commission*, 137 Pa. Superior Ct. 325, 9 A.2d 447 (1939); *Beaver Valley Water Co. v. Public Service Commission*, 76 Pa. Superior Ct. 255 (1921) *aff'd* 271 Pa. 358, 114 A. 373 (1921); *T.W. Phillips Gas & Oil Co. v. Pennsylvania Public Utility Commission*, 50 Pa. Commonwealth Ct. 217, 412 A.2d 1118 (1980); *Equitable Gas Co. v. Pennsylvania Public Utility Commission*, 45 Pa. Commonwealth Ct. 610, 405 A.2d 1055 (1979). *See* I A. Priest, Principles of Public Utility Regulation 164-165 (1969) (authorities discussed).

For example, the Supreme Court could hardly have been more clear on the point when, by Mr. Justice Jones, it wrote:

More than half a century ago it was held that "the basis of all calculations as to the reasonableness of the rates to be charged . . . must

be the fair value of the property being used by it for the convenience of the public . . . . what the company is entitled to ask is a fair return upon the value of that which it employs for the public convenience": Smyth v. Ames, 169 U.S. 466; . . . Public Utility Law of May 28, 1937, P.L. 1053, §311, 66 P.S. §1151.

In Pittsburgh v. Pa. P.U.C., 187 Pa. Superior Ct. 341, 349, 144 A.2d 648, the Court recognized the rule which for decades has been the law in Pennsylvania: "Fair value for rate-making purposes, however, is not the literal present fair value for any particular purpose, but is the fair value of the property as that term is understood for rate-making purposes; in this respect, fair value has a connotation peculiar to rate proceedings. There is no particular formula by which the Commission is bound in fixing the rate base; all facts which have a relevant bearing on fair value, as that term is used in rate proceedings, should be considered . . . 'Under the fair value rule prevailing in this state, consideration should be given to original cost and average price reproduction cost of the property; . . .' " (Emphasis deleted) (some citations omitted).

*Scranton v. Scranton Steam Heat Co.*, at 401-402, 176 A.2d at 88. Pennsylvania, then, has been, since the first demarcation of conceptual positions, a "fair value" ratemaking jurisdiction. Moreover, this classification, as the quotation from the Court's opinion in *Scranton* makes clear, has been held to be required both by judicial decision and by the terms of the applicable legislative enactment—the Public Utility Code.

On this score, Section 1311 of the Public Utility Code of 1978,[4] entitled "Valuation of property of a public utility," is a reenactment of Section 311 of the Public Utility Code of 1937,[5] relied on by the Court in *Scranton,* and provides as follows:

> The Commission may, after reasonable notice and hearing, ascertain and fix the fair value of the whole or any part of the property of any public utility, insofar as the same is material to the exercise of the jurisdiction of the Commission, and may make revaluations from time to time and ascertain the fair value of all new construction, extensions and additions to the property of any public utility.

The reenactment without change, in 1978, of Section 311, following the *Scranton* decision, would seem, by the mandate of Section 3 of the Statutory Construction Act, 1 Pa. C. S. 1922(4), to require a present construction incorporating the view expressed in *Scranton* that the regulatory provision compels the use in Pennsylvania of a fair value rate base.

Also relevant to this inquiry is Section 1310 of the Code, 66 Pa. C. S. §1310, having to do with temporary rates, and providing that the Commission may prescribe rates for a trial period whenever it is of the informed opinion that the current utility rates "produc[e] a return in excess of a fair return upon the fair value of the property of such public utility."

In conclusion, until quite recently the required use by the Commission of the fair value methodology and the attendant categorization of Pennsylvania as a fair value jurisdiction was established beyond peradventure. To be sure, the Commission contends with some

---

[4] Act of July 1, 1978, P.L. 598, No. 116, 66 Pa. C. S. §1311.

[5] Act of May 28, 1937, P.L. 1053, 66 P.S. §1151.

force that a recent judicial decision has accomplished a change in this regard and we will shortly undertake an analysis of that contention. Before we do so, however, we will examine arguments advanced by the intervenor Office of the Consumer Advocate and by the Commission in its written argument before this Court to the effect that the Commission did not, in this case, depart from the fair value methodology.

### D. DID THE COMMISSION HERE EMPLOY ORIGINAL COST OR FAIR VALUE?

In its order now subject to review, the Commission describes the operative principle governing the valuation of PG&W's rate base as follows:

> We have adopted consistently in recent decisions an original cost measure of value[1] for rate base determinations.

> As in [Pa. P.U.C. v.] Carnegie [Natural Gas Company, R-791009797, Order of July 17, 1980], we will account for the effects of inflation in our determination of a fair rate of return, and we therefore find no reason to utilize trended cost figures [the only evidence adduced concerning current property value] in the determination of the fair value of PG&W's water properties.

Footnote 1 contained in the excerpt refers the reader to four recent decisions of the Commission.[6] Our re-

---

[6] Inasmuch as the issue has not been raised, we express no view on the propriety of the Commission's "incorporation by reference" of discussion, reasoning, and conclusions set forth in other decisions. However, it is axiomatic that the conclusions reached by the Commission must be supported by the evidence in this case. The Commission here describes the evil of "fair value" rate base valuation as impermissibly "double counting" for inflation. Office of the Consumer Advocate witness James Rothschild testified "since

view of these decisions reveals that each contains a discussion of the major arguments, which we have set forth above, frequently advanced in favor of and opposing the paradigm of depreciated original cost valuation and the recognition that the Commission has traditionally employed a fair value approach and each concludes with the Commission's stated intention to now adopt adjusted original cost as the measure of value.

Despite the apparently forthright manner in which the Commission has embarked on a method of rate base valuation heretofore forbidden, argument is now made that the Commission continues to employ, and employed in this instance, the traditional fair value method. For example, the Consumer Advocate contends that this is simply a case in which "[t]he Commission was presented with substantial evidence to support its determination that the fair value of PG&W's plant in service was its original cost." Similarly, the Commission summarizes its position in the written argument presented to this Court to be

we need to allow for inflation once and only once, a fundamental mismatch would be created if both the cost of capital computations and the measure of value computations gave *full* allowance for inflation." (Emphasis added.) Assuming this criticism to be well-taken, it has questionable applicability to PG&W's fair value claim which, far from proposing the full recognition of the effects of inflation, requested value to be fixed at approximately $104 million, a figure less than one-fifth of the way between depreciated original cost and tranded original cost. On the issue of whether inflation may be recognized wholly in the measure of rate base or wholly in the rate of return or partially in each, Mr. Rothschild testified that the choice of methods is without economic significance and that "[r]esults would be the same if either method was correctly and completely followed. . . . If rate base provides for partial allowance for inflation, then the cost of capital should provide for whatever portion of the allowance for inflation is not included in the rate base computations."

that a recent judicial pronouncement "has expressly authorized the Commission's use of *an original cost fair value.*" (Emphasis added.)

Of course, in the factual context of a particular rate case, involving, for example; recent capital investment, essentially stable prices generally, and the absence of technological advancement, original cost and fair value rate base measures might be equivalent. Another hypothetical instance in which fair value might equal original cost, at least in a case where only estimates of reproduction cost are proffered as evidence of current value, is described in *Scranton v. Scranton Steam Heat.*

> Original cost means original cost of construction of the facilities and is a factor which *must* be considered by the Commission in arriving at the "fair value" for ratemaking purposes. ... In addition, reproduction cost of a utility's facilities is a factor which *must* be considered and weighed by the Commission in arriving at "fair value." The only reason for according little or no weight to the cost of reproduction is where the facilities have become so obsolete as to make highly improbable and unlikely the facilities' reproduction. (Emphasis in original.)

*Id.* at 402, 176 A.2d at 88.

The instant record contains no evidence and, indeed, neither the respondent nor the intervenor has argued, that the trended cost figures adduced by PG&W's expert witness are inaccurate or unsuitable for determining current property value. The unrebutted evidence is that PG&W's original cost depreciated on March 31, 1980 was $86,492,338 while its trended depreciated original cost on that same date

348

was $344,367,112. PG&W's valuation expert, J. Richard Tompkins, testified that the nearly one quarter of a billion dollar difference between these figures was the result of substantial investment by PG&W's corporate predecessor in the late nineteenth century[7] which investments were made in dollars of substantially higher than current value. A portion of Mr. Tompkins testimony follows:

The early foresight in the planning, design and construction of these facilities at a time when waterworks construction costs were low has produced an efficient and economical gravity flow water supply system which should continue to provide adequate service into the future. Furthermore, I emphasize that in spite of encroachments and changed regulations governing water quality standards through the years, only 3% of the total input to the system required filtration during 1979 and, excluding booster pumping in isolated areas, a lesser amount required high service pumping. These factors have produced and will continue to produce the most economical and satisfactory quality of water service to PG&W's customers. Other water supply systems have required the installation and operation of costly treatment and filtration facilities to upgrade their water quality. The nucleus of PG&W's water source of supply, however, has remained basically unchanged.

No evidence having a contrary import was adduced.

---

[7] Thirty-four of PG&W's reservoirs currently in service were constructed prior to 1900. Many of these reservoirs are of masonry construction with service lives in excess of one century. Connection of these sources to PG&W's distribution system is by means of cast iron mains, the service lives of which also exceed 100 years.

We reject the contention that the Commission simply chose, for reasons having to do with the particular evidence presented, to accord little weight to PG&W's estimates of current value. As the Supreme Court of Illinois has written in response to an identical late unwillingness to call a spade a spade:

> Thus, the contention of the Commission and the intervenors that in fixing the rate base the Commission complied with the previous holdings of this court by "considering" the reproduction-cost evidence and rejecting it, and computing the fair-value rate base on original cost is unsound in fact and in theory. It has not set a fair-value rate base. It has instead set an original-cost rate base. It is not the reproduction-cost evidence which the Commission rejected. It is the fair-value method of determining the rate base which was rejected in favor of the original cost.

*Union Electric Company v. Illinois Commerce Commission*, 77 Ill.2d 364, 370, 396 N.E.2d 510, 517 (1979). Professor Priest has this to say of other attempts to so obfuscate the issue:

> In major Kansas and Mississippi cases, unimpeached testimony as to value was "considered," but was given no weight. Rate bases were predicated solely on original cost depreciated in each instance. In effect, "original cost" and "reasonable value" were battered into synonymity. But the two terms are not synonymous which should be patent beyond the need for argument. A state legislature's declaration that, as a matter of public policy, original cost shall be the sole criterion for determining a public utility's rate base clearly would be upheld. But when a state legislature

says "reasonable value," it does not mean "original cost" or prudent investment." Attempts to torture "value" out of its plain meaning seem sheer casuistry.

I A. Priest, Principles of Public Utility Regulation 167. As the Commission quite accurately wrote in its order "[w]e have adopted . . . an original cost measure of value . . ." We will now turn to the issue of the legality of that decision.

E. THE EFFECT OF PENNSYLVANIA PUBLIC UTILITY COMMISSION V. PENNSYLVANIA GAS AND WATER, 492 Pa. 326, 424 A.2d 1213 (1980)

As we have discussed, the use by the Commission of any rate base valuation paradigm other than fair-value was held to violate both statutory and decisional mandate in *Scranton v. Scranton Steam Heat* and in a plethora of other cases both before and since. The single authority relied on by the Commission and the intervenor for the contrary proposition is the opinion of the Supreme Court finally deciding issues raised by PG&W's last rate case and reported at *Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water*, 492 Pa. 326, 424 A.2d 1213 (1980) *cert. denied* 454 U.S. 824 (1981). The case cited concerned consolidated appeals from this Court in which rate base valuations of PG&W's property by the Commission were held to be erroneous. The substantive issue exclusively addressed on appeal to the Supreme Court arose from our decision reported at 19 Pa. Commonwealth Ct. 214, 341 A.2d 239 (1975) and was whether the Commission properly excluded from PG&W's rate base all value associated with a $2.7 million reservoir, dam, and pipeline constructed with funds contributed by the Pennsylvania Department of Transportation and intended to compensate PG&W

for the disruption of its watershed lands accomplished by the construction of Interstate Highway I-80. This Court held that the Commission improperly excluded these facilities from the rate base. The Supreme Court reversed, describing the issue before it and the contentions of PG&W as follows:

> In refusing to include the $2.7 million contribution made by the Commonwealth toward the capital construction costs of the reservoir and pipeline necessitated by the anticipated impact of the federally aided highway construction project in PG&W's rate case, the PUC in effect disallowed PG&W an addition to the original cost measure upon which the property in question was valued. In so doing, PG&W contends that the PUC contravened the controlling statutory norm requiring it "to ascertain and fix the *fair* value of the whole or any part of the property of any public utility." Public Utility Law, §311, 66 P.S. §1151 (emphasis supplied). PG&W further contends that this statutory norm of "fair value" either incorporates by reference the meaning of that term as adumbrated in Smyth v. Ames, [169 U.S. 466 (1898)] or, in the alternative, is bottomed on the continuing validity of Smyth as a standard for adjudicating the constitutionality of rate regulation under the Federal Constitution.

*Id.* at 336, 424 A.2d at 1218.

Of course, as the Court discusses at a later point in the opinion and as we have here discussed in relation to the *Hope Natural Gas* case, *Smyth v. Ames* no longer controls the issue of the ratemaking requirements of the Federal Constitution. On the alternative issue of whether the Pennsylvania Public Utility Code requires fair-value rate base valuation,

the Court first opines that the legislative history of the enactment offers no clear answer[8] and then "assuming *arguendo* that the legislature intended to acquiesce in the 'fair value' principle" concludes that the Commission complied with this mandate.

> Thus, "fair value" as understood in Smyth v. Ames does not compel reversal of the PUC's determination either as a matter of statutory or constitutional law. In the instant case, the PUC duly considered the evidence proffered by PG&W as to the reproduction cost of the watershed properties but concluded that, under the circumstances of the particular case, the allowance of any addition to original cost figures for ratemaking purposes was not just and reasonable and that the 2.7 million dollar payment could be more appropriately treated as a "contribution," as it was designated by the agreement between PG&W and the Department of Highways, rather than as an additional investment of capital.

*Pennsylvania Public Utility Commission v. Pennsylvania Gas & Water*, 492 Pa. at 339, 424 A.2d at 1220. To repeat, the Supreme Court did not hold that the Commission is now free to embrace the original cost paradigm and to reject the general usefulness of fair value for ratemaking purposes. Instead the Court sustained the Commission's rejection of reproduction cost figures in valuing a small portion of PG&W's property and held that the rejection of reproduction cost was justified by the peculiar factual context which involved the construction of the facility largely with funds contributed by an agency of the Commonwealth.

---

[8] The effect of *Scranton v. Scranton Steam Heat* and the subsequent legislative reenactment of Section 311 of the Public Utility Code is not addressed.

We note that in the rate case giving rise to our 1975 order the Commission utilized a fair-value standard with respect to the whole of PG&W's property and fixed the fair value at the approximate midpoint between original cost and trended original cost.

Nevertheless, the Commission and the intervenor here rely on another portion of the Supreme Court's opinion in which several "deep rooted fallacies" are exploded and particular weight is placed on the following language:

> Properly understood, Smyth v. Ames speaks only to the outer boundaries beyond which, on the one hand, a regulator approaches an uncompensated eminent domain taking of investor property by valuing it below its original cost and, on the other hand, a regulator approaches an unlawful taxation of consumers under the guise of rate fixing by valuing the property in excess of its reproduction cost. Between these extremes, the question is one of policy for the regulatory body concerning which the judicial branch is not warranted in interposing economic theories. Unless the PUC's decision does not bear a real and substantial relationship to the regulatory objects sought to be obtained by it, that judgment must prevail.

*Id.* at 339, 424 A.2d at 1220. Reliance is also placed on the following language:

> Reproduction cost figures are clearly admissible in PUC proceedings but we see nothing in the "fair value" rule that requires, either as a statutory or constitutional mandate, that they *must* be *accepted* in whole or in part for valuation purposes. We, therefore, repudiate any intimations in these decisions or in prior case law that has the effect of suggesting a constitu-

tional mandate requiring the inclusion of repro-·
duction cost figures in arriving at the appro-
priate rate structure in public utility valuation
cases. (Emphasis in original.)

*Id.* at 340-341, 424 A.2d at 1221. From these state-
ments alone and in combination with the Supreme
Court's statement "that the overriding principle gov-
erning the PUC's performance of its duty is to de-
termine 'just and reasonable' rates pursuant to Pub-
lic Utility Law, §301, 66 P.S. §1141,"[9] the Commis-
sion and the intervenor divine an express authoriza-
tion of the Commission's rejection in principle of the
fair value paradigm and the adoption, irrespective of
the facts of particular rate cases, of depreciated orig-
inal cost as the exclusive measure of rate base value.
We agree that the statements arguably support the
position proposed but they are equally consistent with
the proscription of the original cost "extreme" and
with the retention of the fair value principle as a
*statutory* requirement. Mindful of our role as an
intermediate appellate court we feel compelled to
await a clearer signal by the legislature or by the
Supreme Court before granting our imprimatur to
Commission action so long and universally held to
be violative of one of the fundamental precepts of
this state's public utility regulatory procedure.

## II "RATE OF RETURN"

PG&W also contests the Commission's fair rate
of return determination asserting, briefly, that the
Commission erred in the weight given to the Dis-
counted Cash Flow method of estimating the projected
cost of common equity. Our review of the record
indicates that the testimony of James Rothschild, ex-

---

[9] Now codified at 66 Pa. C. S. §1301.

pert rate of return witness for the intervenor Office of the Consumer Advocate, lends adequate support to the primary use of the Discounted Cash Flow method. However, the Commission here explicated a conceptual interdependency on the part of the rate of return and the method chosen for rate base valuation:

> [To] account for inflation both in a determination of fair value and again in a determination of a fair rate of return, may result in a double counting for the effects of inflation. .... Accordingly, the effects of inflation will be accounted for completely in our determination of a fair rate of return.

Therefore, in the light of our reversal of the Commission's original cost rate base determination and the relationship described by the Commission between the rate of return and the rate base valuation method, we must also remand the record for further proceedings on this aspect of the case.

### III    OTHER PROPOSED ADJUSTMENTS

By petition for Review, the Office of the Consumer Advocate (OCA) challenges the Commission's refusal to make three proposed adjustments to PG&W's revenue and expense computations.

### A.    GAIN ON THE SALE OF WATERSHED PROPERTY

Evidence was adduced by the OCA to the effect that some thirty parcels of PG&W's watershed land, no longer used and useful in the public service, were conveyed to others during the period subsequent to PG&W's last rate case at a profit after expenses of $336,537. The OCA proposed that this figure be amortized over ten years and included in PG&W's income with the effect of reducing the utility's revenue requirements.

As the Commission recognized, this issue is controlled by our decision in *Philadelphia Suburban Water v. Pennsylvania Public Utility Commission,* 58 Pa. Commonwealth Ct. 272, 427 A.2d 1244 (1981), *appeal dismissed* September 2, 1981. We there held that gain from the sale of land is to be credited to a shareholder surplus account and does not inure to the benefit of the ratepayers inasmuch as the shareholders contributed the capital from which the land was purchased and bore the risk of any decline in the value of the land.

The OCA argues that judicial decisions in other jurisdictions permit land transaction gain to be placed "above the line" into utility income, that the contrary treatment required by the Pennsylvania Uniform System of Account should not control, and that it is fundamentally unfair for changes in land value to be credited (or debited) to shareholder's surplus because land only appreciates in value. Each of these arguments was considered in detail in *Philadelphia Suburban Water Company* and we see no reason to depart from our earlier decision.

Finally, the OCA argues that the proposed treatment of gain from land sales is necessary "so that utilities do not manipulate land sale transactions [sic] the detriment of ratepayers." In this regard the OCA speculates that a regulated utility might determine whether to retain a parcel of land in rate base on the basis of whether the parcel's current market value is greater than or less than its cost to the utility. There is no evidence in this record that any such consideration governed any of PG&W's decisions to purchase or to sell land and the unrebutted testimony of David J. Smith, PG&W's General Manager of Real Estate, was that internal accounting and review procedures would render impossible such artifice.

## B. Expenses Related to Theta Land Corporation

Sales by PG&W of watershed lands are accomplished by the conveyance of the land to a non-regulated affiliate, Theta Land Corporation. All of Theta's activities are carried out by employees of PG&W housed in PG&W's corporate headquarters. Working hours devoted by PG&W's employees to the business of Theta are charged to Theta and the amount of these charges are not now disputed. However, the OCA proposed that an additional charge to Theta for overhead, in the amount of $10,000, was necessary. This figure was described by OCA's witness as somewhat arbitrary and was calculated with reference to the market price of office space in the geographic area of PG&W's headquarters.

PG&W proposed that the amount of overhead expense properly chargeable to Theta should instead be calculated by applying the ratio of hours devoted to Theta's operations divided by the total employee hours at that location to the total overhead expense at that location. The administrative law judge and the Commission accepted PG&W's proposed measure of Theta's overhead expenses and determined the amount of such expense so calculated ($180.00) to be insufficient to require an adjustment. We are in complete agreement with Administrative Law Judge HOFFMAN who reasoned as follows:

> The undersigned detects no error in the methodology used by PG&W to demonstrate that the proper annual charge to Theta for use of PG&W facilities is $180. The OCA does not point out any error. Rather, the OCA dismisses the amount as absurd, on the grounds that commercial office space cannot be rented at that price. It is true that office space can-

not be rented for $180 a year, but that is not the issue. This issue is what actual costs properly attributable to Theta are being borne by PG&W ratepayers. The answer appears to be $180, an amount too small to justify an adjustment in this case.

## C. Legal Expense

Finally, the OCA contends that $82,901 of PG&W's legal expense ought to have been disallowed because the law firm engaged by PG&W is, in the OCA's view, an "affiliated interest" the contracts of which are required to be but are not the subject of written approval by the Commission.

The definition of affiliated interest is found at 66 Pa. C. S. §2101. Of the seven subparts of this definitional provision, the OCA argues for the applicability of only one:

(a) General Rule.—As used in this part "affiliated interest" with a public utility means and includes the following:

. . . .

(4) Every person who is an officer or director of such public utility or of any corporation in a chain of successive ownership of 5% or more of the voting securities.

The pertinent facts are that Charles Thomas, Esquire is a member of the board of directors of PG&W and its corporate parent, Pennsylvania Enterprises Incorporated, and is a partner of the law firm of Thomas and Thomas which law firm is engaged by PG&W with respect to litigation before the Commission.

On this issue the Commission first determined that the contested expenses were reasonable. The Commission then declined to address the issue of whether

a law firm is included within the meaning of "every person who is an officer or director of such public utility" if a member of the law firm is an officer or director of the utility. The Commission wrote.:

> Concerning the legal issue of whether a director of a utility who provides legal services to the utility is the type of affiliated interest encompassed within the provisions of Section 2102 of the Code is a matter best suited for resolution in a generic proceeding rather than on a case by case basis. We do not find it appropriate to deny recovery of legal fees in this case prior to a determination in generic proceedings of the applicability of Section 2101 of the Code, particularly where there is no evidence of record which would support a finding that these legal fees are unreasonable.

In sum, the OCA's objection to the fees is entirely technical, concerning the absence of prior contract approval by the Commission. The granting of such approval, if required, is a matter within the Commission's discretion. The Commission has now reviewed the compensatory arrangement at issue and has determined it to be reasonable. Given these considerations, we can see no abuse of the Commission's discretion for that body to determine that the issue raised by the OCA is more appropriately addressed by means of rulemaking rather than adjudication.

Accordingly we enter the following

## ORDER

AND Now, this 28th day of February, 1983, the order of the Pennsylvania Public Utility Commission in the above-captioned matter is reversed insofar as it adopts an original cost measure of rate base valuation and the record is remanded for further proceed-

360

ings on the issue of the fair value of PG&W's property devoted to the public service. Such additional proceedings as the Commission deems necessary to determine a fair rate of return to be applied to a fair value rate base are also directed. In all other respects the order of the Pennsylvania Public Utility Commission in the above-captioned matter is affirmed.