515 A.2d 651

David M. Barasch, Consumer Advocate, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

W. Wilson Goode, Mayor, City of Philadelphia, Petitioner v. Pennsylvania Public Utility Commission, Respondent.

Township of Cheltenham, Township of Abington, Township of Lower Merion, Township of Upper Dublin, Township of Upper Merion, Township of Upper Moreland, Township of Whitemarsh and Borough of Rockledge, Petitioners v. Pennsylvania Public Utility Commission, Respondent.

Argued June 11, 1986, before President Judge CRUMLISH, JR., Judges CRAIG, MACPHAIL, BARRY and COLINS.

*Scott J. Rubin*, Assistant Consumer Advocate, with him, *Irwin A. Popowsky, David Wersan* and *Robert P. Haynes, III*, Assistant Consumer Advocates and *David M. Barasch*, Consumer Advocate, for petitioner, David M. Barasch, Consumer Advocate.

*Kathryn S. Lewis*, Chief Deputy City Solicitor, with her, *Ralph J. Luongo* and *Charles E. Rainey, Jr.*, Assist-

ant City Solicitors, and *Barbara W. Mather*, City Solicitor, for petitioner, W. Wilson Goode, Mayor, City of Philadelphia.

*George B. Ditter, Jenkins, Tarquini & Jenkins*, for petitioners, Townships of Cheltenham, Abington, Lower Merion, Upper Dublin, Upper Merion, Whitemarsh and Borough of Rockledge.

*Veronica A. Smith*, Assistant Counsel, with her, *Daniel P. Delaney*, Deputy Chief Counsel, *Albert W. Johnson, III*, Deputy Chief Counsel, and *Charles F. Hoffman*, Chief Counsel, for respondent.

*David B. MacGregor*, with him, *Robert H. Young, Donald F. Clarke* and *Jack E. Jerrett, Morgan, Lewis and Bockius*, and of counsel: *Edward G. Bauer, Jr.*, Vice President and General Counsel, for intervenor, Philadelphia Electric Company.

OPINION BY PRESIDENT JUDGE CRUMLISH, JR., September 29, 1986:

The Office of Consumer Advocate (OCA), the City of Philadelphia (City) and eight suburban Philadelphia municipalities (municipalities)[1] separately appeal a Pennsylvania Public Utility Commission (Commission) order granting Philadelphia Electric Company (PECO) a base rate increase of $149,636,000. These appeals were consolidated for argument and disposition. We affirm the Commission order as to all three appeals.

On April 27, 1984, PECO filed Supplement No. 23 to Tariff Electric—Pa. P.U.C. No. 26, to become effec-

---

[1] The Township of Cheltenham, the Township of Abington, the Township of Lower Merion, the Township of Upper Dublin, the Township of Upper Merion, the Township of Upper Moreland, the Township of Whitemarsh, and the Borough of Rockledge.

tive January 27, 1985. This supplement contained a base rate increase of approximately $252,000,000 predicated upon historic and future test years ending December 31, 1983, and December 31, 1984, respectively. After complaints were filed against PECO's proposed rate increase by the OCA, the City, the municipalities, and other parties, the Commission suspended Supplement No. 23 for seven months and instituted an investigation into its lawfulness and reasonableness. Following public hearings, an administrative law judge (ALJ) issued a November 27, 1984 recommended decision. Ruling upon exceptions to the ALJ's recommended decision, the Commission on January 25, 1985, issued the order granting the $149,636,000 rate increase[2] from which the appeals now before us were taken.

Our scope of review of a Commission order in a rate case is limited to determining whether the Commission violated constitutional rights, committed an error of law, or made findings of fact that are not supported by substantial evidence. *Green v. Pennsylvania Public Utility Commission,* 81 Pa. Commonwealth Ct. 55, 473 A.2d 209 (1984), *aff'd sub nom., Barasch v. Pennsylvania Public Utility Commission,* 507 Pa. 430, 490 A.2d 806 (1985).

## OCA APPEAL

*Surplus on Cancellation of Construction Contracts*

In its appeal, the OCA challenges the Commission's decision not to deduct from PECO's rate base a surplus of $7,448,362 in payments received from General Atomic Corporation (GAC) in settlement of GAC's can-

---

[2] This increase was offset by a $101,055,000 reduction in PECO's Energy Cost Rate, resulting in a net rate increase of $48,581,000.

cellation of contracts for construction of two nuclear generating stations, Fulton and Summit, in which PECO had invested funds.[3]

The OCA contends that the Commission erred in not deducting the $7,448,362 surplus from rate base because these monies were not supplied by investors. We disagree.

The ALJ and the Commission both declined to reduce PECO's rate base to reflect the surplus of the GAC payments because the cancelled construction projects were funded entirely by PECO's shareholders, not by its ratepayers.[4] They cited our decision in *Philadelphia Suburban Water Co. v. Pennsylvania Public Utility Commission*, 58 Pa. Commonwealth Ct. 272, 427 A.2d 1244 (1981), where we held that the Commission erred by crediting to a utility's revenues surplus proceeds on the sale of land acquired through shareholder capital.

The OCA urges that *Philadelphia Suburban Water* does not control because this case involves cancelled depreciable assets, the construction costs of which could be recovered from ratepayers. *Cohen v. Pennsylvania Public Utility Commission*, 90 Pa. Commonwealth Ct. 98, 494 A.2d 58 (1985). Conversely, *Philadelphia Suburban Water* dealt with a sale of land, a loss on which we therein stated would not be the responsibility of ratepayers. The OCA asserts that, as PECO's

---

[3] PECO alone undertook to plan and design the Fulton station. It joined with Delmarva Power and Light Company in planning and design work on the Summit station.

PECO's accounts showed a loss of $5,108,613 on the Fulton station and a gain of $12,556,975 on the Summit station. Reproduced Record, p. 185a.

[4] The OCA does not dispute PECO's representation that the Fulton and Summit projects were financed solely by investor-supplied funds.

ratepayers would have borne any unrecovered costs for the cancelled projects, they should also benefit from a gain on cancellation. We do not agree.

Although utilities have been allowed to recover the *prudently incurred* construction costs of cancelled nuclear power projects from ratepayers as an amortized expense, *Cohen,* this is a narrow exception to the general rule that ratepayers do not compensate a utility for a loss on an investment. The purpose of this exception is to avoid the severely debilitating effects upon a utility's fiscal condition and, concomitantly, its ability to serve the public, which would result if the multi-million dollar funding of a cancelled nuclear power project's construction was not recouped. These monies are recovered from ratepayers on the theory that they are a necessary aspect of a utility's obligation to provide public service. A gain on an investment, however, should benefit those who have provided the funding. This is the principle upon which our economic system was built. It is also the principle we relied upon in *Philadelphia Suburban Water* and which controls in this case.

The OCA further argues that the Commission's refusal to deduct the surplus of the GAC payments was arbitrary and capricious in light of the treatment accorded two other items in the Commission's order. This argument likewise fails.

The Commission permitted PECO to recover $2,296,000 in losses incurred when its contractor cancelled construction of a uranium mining project. The OCA claims that this is inconsistent with the denial to ratepayers of the benefit of the gain on GAC's contract cancellation. As we noted above, however, the recovery of cancelled construction project costs is necessary to

ensure that a utility remains fiscally sound and able to adequately serve the public.[5]

The OCA also points to the Commission's deduction from PECO's rate base of $6.9 million received from a third party, Hercules Corporation (Hercules), in connection with the sale of tax benefits associated with the Salem Unit No. 2 nuclear generating station. It claims that the treatment of these monies is irreconcilable with the Commission's treatment of the GAC surplus. We disagree. The payments by Hercules were in compensation for the lost time value of monies related to the receipt of the Salem Unit No. 2 tax benefits. In contrast, the payments by GAC were in satisfaction of the investment by PECO's shareholders in the Fulton and Summit projects. Moreover, while the Fulton and Summit projects were never supported by ratepayers, Salem Unit No. 2 was included in PECO's rate base and thus paid for by ratepayers. A reasonable basis clearly exists for the Commission's different treatment of these payments.

We hold that the Commission did not err by refusing to deduct the surplus of GAC's payments from PECO's rate base.

### Land Held for Future Use

The OCA's appeal also challenges the Commission's inclusion in PECO's rate base of $7,762,000, representing the value of seven parcels of land held for future use. The OCA contends that the Commission erred because the inclusion of these monies in rate base is

---

[5] We note that PECO's claim for amortization was reduced by some $4 million to reflect the amount PECO earned on its investment in the mining project.

prohibited by Section 1315 of the Public Utility Code (Code).[6] We reject this contention.

Traditionally, the Commission has permitted a utility to include in rate base the value of land held for future use if two criteria are met: (1) that there is a definite plan for the use of the land in the utility's future operations, and (2) the planned use of the land will be in service within the next ten years. *See, e.g., Pennsylvania Public Utility Commission v. Pennsylvania Power & Light Co.,* 58 Pa. P.U.C. 81 (1983). Section 1315 states:

> Except for such nonrevenue producing, nonexpense reducing investments as may be reasonably shown to be necessary to improve environmental conditions at existing facilities or improve safety at existing facilities or as may be required to convert facilities to the utilization of coal, the cost of construction or expansion of a facility undertaken by a public utility producing, generating, transmitting, distributing or furnishing electricity shall not be made a part of the rate base not otherwise included in the rates charged by the electric utility until such time as the facility is used and useful in service to the public. Except as stated in this section, no electric utility property shall be deemed used and useful until it is presently providing actual utility service to the customers.

In *Cohen,* we held that Section 1315 does not prohibit the Commission from including land held for future use in rate base, having there concluded that Section 1315 only contemplates the disallowance from rate base of construction work in progress and that the "used and useful" concept only pertains to rate base questions. The OCA asks us to now overrule *Cohen,* assert-

---

[6] 66 Pa. C. S. §1315.

ing that we misapprehended the nature of land held for future use. We decline to overrule *Cohen*. The OCA misconstrues our holding in *Cohen*. Our holding was not grounded upon land held for future use being an item outside rate base. Rather, we held that, as Section 1315 only applied to construction work in progress, land held for future use was not subject to exclusion from rate base under that section.

We reaffirm *Cohen*[7] and, accordingly, hold that the Commission did not err in allowing PECO to include in rate base the $7,762,000 in land held for future use.

### City Appeal

In its appeal, the City focuses on the 16.7 percent increase in the rate for its street lights (SLP) approved by the Commission.

The City first contends that the Commission's decision is inadequate because it fails to explain the basis for the determination that PECO's allocation of distribution costs for the SLP class was reasonable. This argument lacks merit.

Section 703(e) of the Code[8] requires that "[the Commission's] findings shall be in sufficient detail to enable the court on appeal, to determine the controverted question presented by the proceeding, and whether proper weight was given to the evidence." We have held that a Commission decision is adequate where, on each of the issues raised, the Commission was merely presented with a choice of actions, each fully developed in the record, and its choice on each issue amounted to

---

[7] By reaffirming our *Cohen* decision, we reject the OCA's contention that land held for future use is excluded from rate base as a non-used and useful "facility" within the definition of Section 102 of the Code, 66 Pa. C. S. §102.

[8] 66 Pa. C. S. §703(e).

an implicit acceptance of one party's thesis and the rejection of the other party's contention. *UGI Corp. v. Pennsylvania Public Utility Commission*, 49 Pa. Commonwealth Ct. 69, 410 A.2d 923 (1980).

The record compiled in this proceeding fully developed the contending positions regarding the proper method of allocating distribution costs between the customer and demand components. The Commission's decision summarized and critiqued the proposals of each party. The Commission then resolved the issue by stating:

> [T]he main issue in this proceeding is whether or not [PECO's] cost of service study is acceptable, taking into consideration the purpose of such a study; that is, to establish a limit upon which rates may be increased or decreased for any specific customer classification. Based upon the evidence presented, we conclude that [PECO's] cost of service study . . . is acceptable.

Commission decision, p. 137. This language clearly indicates that the Commission found PECO's allocation of distribution costs to the SLP class reasonable, as that was the precise aspect of the cost-of-service study attacked in the proceeding. We therefore conclude that the Commission's decision is sufficiently detailed to permit judicial review.

The city next contends that the Commission lacked an evidentiary basis for accepting PECO's cost-of-service study because the study's results showed it to be unreliable as a guide in setting rates. It urges that the study, which was formulated using a "predominant minimum size" approach rather than a "minimum size" or "zero intercept" approach,[9] classifies an inordinate amount of the SLP class' distribution costs as fixed customer-related costs. We reject this argument.

------

[9] Under the predominant minimum size approach, a utility determines the predominant facility for each type of equipment

The establishment of a rate structure is an administrative function that is peculiarly within the Commission's expertise. *Bell Telephone Co. v. Pennsylvania Public Utility Commission,* 47 Pa. Commonwealth Ct. 614, 408 A.2d 917 (1979). Whether rates are reasonable is a factual question for the Commission, which we will not disturb if it is supported by competent evidence. *Zucker v. Pennsylvania Public Utility Commission,* 43 Pa. Commonwealth Ct. 207, 401 A.2d 1377 (1979).

Our review of the record reveals competent evidence supporting the Commission's acceptance of PECO's cost-of-service study. William F. Sundemeir, a mechanical engineer in charge of PECO's Cost and Load Analysis Section, testified that the predominant minimum size approach, unlike the minimum size-zero intercept approach, "properly reflects conditions as they actually exist .in PECO's distribution system."[10] Sundemeir went on to comment on weaknesses in the theoretical cost approach suggested by a witness for the City: "The approach proposed by Dr. Ileo assumes that *none* of the physical costs of the distribution system vary with number of customers. It is clear that [PECO] could not provide service to customers by incurring labor costs and no material costs, as is assumed by Dr. Ileo."[11] (Emphasis in original.) Accordingly, the Commission's acceptance of PECO's cost-of-service study must stand.

---

used in a particular distribution account. The customer-related cost is determined based on the amount of the utility's investment in this predominant facility; the investment in the remaining facilities in each account is allocated to demand-related costs.

The minimum-size/zero intercept approach characterizes customer-related costs as those necessary to provide a minimum distribution system to customers at a nominal power load.

[10] Reproduced Record, p. 317a.

[11] *Id.,* p. 319a.

The final contention by the City is that the SLP rate approved by the Commission violates the principles of gradualism and efficiency.[12] We reject this argument because it is in effect another challenge to the distribution cost allocation contained in PECO's cost-of-service study.

## MUNICIPALITIES APPEAL

In their appeal, the municipalities contest the rate increase granted for street lighting in the suburban Philadelphia areas served by PECO (SLS).

The municipalities initially contend that PECO's cost-of-service study overstated the customer-related costs for the SLS class and understated the rate of return earned by PECO from this class. We reject this contention, which is another challenge to PECO's employment of the predominant minimum size approach. As we stated in detail above regarding the City's appeal, the Commission's acceptance of PECO's cost-of-service study must be upheld because it was supported by competent evidence.

The municipalities next contend that the Commission erred in accepting its trial staff's proposed allocation of rates within the subclasses of the SLS class.[13] This argument must fail.

The trial staff's allocation utilized PECO's cost-of-service assignment of a uniform customer-related cost to all SLS class street lamps—$197.55. The municipalities claim that this figure overstates the customer-related cost of incandescent lamps. They allege that in-

---

[12] The principle of gradualism dictates that rates should not be raised too abruptly. The principle of efficiency dictates that rates be set in a manner which encourages efficient uses of electricity.

[13] The SLS class is broken down into three subdivision: incandescent filament lamps, mercury vapor lamps, and sodium vapor lamps.

candescent lamps are "in all probability" mounted on existing power distribution poles, whereas mercury vapor lamps require their own light standard. From this, the municipalities conclude that it is less expensive to distribute power to incandescent lamps. This contention is wholly speculative. There is no support in the record for the proposition that there are significant differences in the mounting of incandescent lamps and other lamps or that any such differences significantly effect customer-related costs.

The last contention raised by the municipalities is that the rate for incandescent lamps is unreasonably high and does not allow for a gradual changeover to the more efficient mercury and sodium vapor lamps. We must reject this argument. The trial staff's witness, James B. Strausbaugh, testified that the proposed allocation was only designed to bring the rates for the incandescent lamps up to a level where they would recover at least fifty percent of their costs. We must conclude that competent evidence supports the Commission's conclusion that the rate structure for incandescent lamps in the SLS was reasonable.

## CONCLUSION

We conclude that the Commission committed no errors of law and that its findings of fact are supported by substantial evidence. The Commission's order is, accordingly, affirmed.

## ORDER

The Public Utility Commission order at No. R-842590, entered January 25, 1985, is affirmed.

Judge COLINS dissents.