548 A.2d 339

Albert Einstein Healthcare Foundation/University of Pennsylvania and Amtrak, Petitioners *v.* Pennsylvania Public Utility Commission, Respondent.

Argued April 20, 1988, before President Judge CRUMLISH, JR., and Judges CRAIG, MACPHAIL, DOYLE, BARRY, McGINLEY and SMITH.

*Larry B. Selkowitz,* with him, *Mark P. Widoff, Widoff, Reager, Selkowitz & Adler, P.C.* for petitioner.

*Lee E. Morrison,* Assistant Counsel, with him, *Bohdan R. Pankiw,* Deputy Chief Counsel, and *Daniel P. Delaney,* Chief Counsel, for respondent.

*Gerald Gornish,* with him, *John H. Schapiro* and *Jeffrey B. Wolin,* Of Counsel: *Wolf, Block, Schorr and Solis-Cohen,* for intervenor, Philadelphia Electric Company.

OPINION BY JUDGE MCGINLEY, September 21, 1988:

This is an appeal by Albert Einstein Healthcare Foundation, University of Pennsylvania, and Amtrak (Petitioners) from an order of the Pennsylvania Public Utility Commission (Commission) setting rates to be charged by Philadelphia Electric Company (PECO) for firm backup power for cogeneration facilities. We affirm.

## BACKGROUND

Congress enacted the Public Utility Regulatory Policies Act of 1978, (PURPA) along with several other statutes, as part of an overall national energy policy. The relevant portions of PURPA are §§201 and 210, codified at 16 U.S.C. §796 and §824a-3, respectively. Section 201 of PURPA defined two types of entities, small power production facilities and cogeneration facilities, which (provided they meet eligibility standards set forth by the Federal Energy Regulatory Commission (FERC)) would be known as "qualifying facilities" or "QFs." A "cogeneration facility" is one which produces both electric energy and steam or some other form of useful energy, such as heat. 16 U.S.C. §796(18)(A). The within matter concerns itself specifically with cogeneration facilities.

Section 210 of PURPA was promulgated to encourage cogeneration and small power production. Section 210(a) directs FERC to promulgate rules to encourage the development of power, including rules requiring utilities to offer to buy electricity from, and to sell electricity to, QFs.

FERC defined four types of power that must be supplied to QFs: supplementary power, back-up power, interruptible power, and maintenance power. 18 C.F.R. §292.101(b). Back-up power is electric energy or capacity which is supplied by an electric utility to replace energy ordinarily generated by a facility's own generation equipment during an unscheduled outage of the facility. Although interruptible power is listed therein as a separate type of power, it is actually not a different type of power, but rather is a method of supplying power. Back-up power (as well as maintenance power) can be supplied on a firm basis, or on an interruptible basis. Firm service requires the utility to provide power to the QF without interruption whenever the QF demands it. Interruptible service permits the utility to interrupt the service to the QF when the utility experiences a capacity shortage on its system. This appeal involves only the rate for firm back-up power.

Section 210(c) of PURPA specifically required that FERC implement regulations insuring that rates for utility sales to QFs be *just, reasonable, in the public interest and not discriminate against QFs.* (Emphasis added.) In *American Paper Institute, Inc. v. American Electric Power Service Corporation,* 461 U.S. 402, 414-415 (1983), the Supreme Court held that Congress intended the phrase "just and reasonable" to be accorded its traditional rate-making meaning.

The FERC regulations provide, *inter alia,* that absent factual data to the contrary, the rates for back-up power may not be based on the assumption that sched-

uled or unscheduled outages will occur simultaneously, or during system peak, or both.

(c) *Rates for sales of back-up . . . power.* The rate for sales of back-up . . . power:

(1) shall not be based upon an assumption (unless supported by factual data) that forced outages or other reductions in electric output by all qualifying facilities on an electric utility's system will occur simultaneously, or during the system peak, or both; and

(2) shall take into account the extent to which scheduled outages of the qualifying facilities can be usefully coordinated with scheduled outages of the utility's facilities.

18 C.F.R. §292.305(c).

Section 210(f) requires each state regulatory authority and nonregulated utility to implement FERC's rules. The Commission implemented the FERC rules by promulgating regulations, with essentially "track" PURPA and the FERC regulations, at 52 Pa. Code §§57.31-57.39. *See* 12 Pa. B. 4237 (December 11, 1982).

The following terms must also be briefly defined. Capacity cost includes the fixed costs of production, transmission and distribution of energy. Capacity cost may be more easily conceived of as the cost to the utility to "stand ready" to supply the energy to its customers, even if the customers never actually consume the energy. Energy costs include the fuel expenses and other variable costs of production of kilowatts of energy which are actually consumed. A customer's maximum "demand" is the largest amount of power it takes in a designated time period, measured in kilowatts (kW) or megawatts (MW = 1000kW). A "demand charge" is a charge made on the basis of demand. "Contract demand" is the maximum demand permitted under the customer's contract with the utility.

## .Procedural History[1]

Petitioners are customers of PECO who buy power under the HT rate schedules. They are all planning or constructing cogeneration facilities to provide a portion of their electrical needs.

On December 30, 1985, PECO proposed Supplement No. 18 to Tariff Electric-Pa. P.U.C. No. 26, containing rates for certain types of service to QFs, including rates and conditions for back-up power. By Order dated February 21, 1986, the Commission suspended the proposed tariff supplement and directed an investigation of the proposed tariff supplement and the existing supplement identified as No. 6.

Numerous parties participated in the investigation.[2] All the parties other than PECO, PAIEUG, and possibly Occidental signed a Stipulation Agreement concerning rates.[3] On May 22, 1986, the ALJ issued a Recom-

---

[1] Pursuant to Pa. R.A.P. 1952(b) the parties to this appeal agreed that neither the record nor a certified list thereof need be filed with this Court, that the filing date shall be deemed the date on which the record is filed, and that the record will be retained by the Commission. Consequently, citations will be to the reproduced records, and not the original record. Citations to the reproduced record provided by Petitioners will be cited as "R.R. at [page number] a." Citations to the supplemental reproduced record provided by the Intervenor, PECO, will be cited as "R.R. at [page number] b."

[2] In addition to PECO, and the Petitioners, parties included the Governor's Energy Council (GEC), Del-Aware Unlimited, Inc. (Del-Aware), the Commission Trial Staff (Trial Staff), Scott Paper Company (Scott), the Office of Consumer Advocate (OCA), the Philadelphia Area Industrial Energy Users Group (PAIEUG), and Occidental Chemical Company (OCC).

[3] PAIEUG did not sign the Stipulation Agreement because it was concerned with issues other than rate levels. R.R. at 4a.

It is unclear from the record before us whether or not Occidental signed the Stipulation Agreement concerning rates. Petitioners and the Commission agree that Occidental was a party to the

mended Decision, in which he found the existing and proposed tariff supplements to be unjust, unreasonable and disciminatory. He adopted a large part of the Stipulation Agreement, including the section of the Agreement which applied to firm back-up power. The ALJ found that there is a small probability that any one cogenerator would have a need for back-up power during system peak, that there is even a smaller probability that *all* cogenerators would suffer an outage during system peak, and that, as a result, there is a relatively small capacity cost responsibility for back-up power.[4] The ALJ recommended that a flat rate be charged per kW of back-up power which is actually consumed by a cogenerator. This rate was intended to cover all of PECO's costs, *i.e.,* both capacity and energy costs. Pursuant to this pricing mechanism, during months in which the customer uses little power, and does not contribute to the need for increased capacity, the customer pays no fee, but as the customer consumes more energy, and thus contributes more to the need for increased capacity, the customer will bear a proportionally greater cost of responsibility for the need for increased capacity. The ALJ stated that:

> This rate design has the benefit of 'levelizing'
> the capacity and energy costs to be recovered
> over the demand and hours usage of back-up

---

Stipulation Agreement, but that Occidental continued to offer its own witness's methodology as an alternative method to the method which was adopted in the Stipulation Agreement. Brief of Petitioners, at 18; Brief for Respondent, at 10, n.2. PECO claims that Occidental never signed the Stipulation Agreement. Brief for Intervenor, PECO, at 5, n.6. We are unable to determine from the record whether or not Occidental actually signed the Stipulation Agreement, although we do not need to resolve this issue in order to decide the case.

[4] ALJ's Recommended Decision, R.R. at 24a.

power. It is a rate which neither subsidizes nor burdens back-up power customers.

Customers paying these rates will not bear greater cost responsibility than the limited demands they place on the utility at system peak, but will bear a proportionally greater cost responsibility as usage increases.[5]

Exceptions to the Recommended Decision and Reply Exceptions were filed by several of the parties, including PAIEUG, Scott, Occidental, and PECO. The Commission entered its order on October 9, 1986. The Order adopted the ALJ's Recommended Decision in most respects, but the Commission modified the Recommended Decision with respect to the rate for firm back-up power. The Commission permitted PECO to collect a minimum monthly charge per kW of contract demand, whether or not any power is consumed, plus a charge per kW of energy actually consumed. However, the monthly minimum charge would be credited against the monthly usage charge: if the price of the total kW actually consumed exceeds the minimum monthly charge, then only the usage fee would be paid; if the charge for the kW consumption is below the minimum monthly charge, then only the minimum monthly charge is to be paid. The Commission also ordered that the rates should be adjusted to reflect the results of the concomitant general rate case which was then pending.[6]

Petitioners filed a Petition for Reconsideration which the Commission denied on June 5, 1987. The instant Petition for Review followed.

---

[5] *Id.* at 26a.

[6] *Barasch v. Pennsylvania Public Utility Commission*, 115 Pa. Commonwealth Ct. 147, 540 A.2d 966 (1988), *Petition for Allowance of Appeal filed*, No. 435 E.D. Allocatur Docket 1988.

## Discussion

Petitioners argue that there is no substantial evidence to support the Commission's rate mechanism because it allows PECO to recover funds in excess of its costs. Petitioners further argue because the rate mechanism is not cost-based, and because it discourages rather than encourages the generation of power by cogenerators, it violates federal and state law.[7]

Our scope of review is limited to a determination of whether there has been a constitutional violation, an error of law or whether the findings of fact are supported by substantial evidence. *Barasch v. Pennsylvania Public Utility Commission*, 108 Pa. Commonwealth Ct. 326, 530 A.2d 936 (1987).

The underpinning of Petitioners' case is their premise that rates must be based on cost. This premise is correct, but Petitioners err in applying this principle to the facts of the case; there is substantial evidence of record to support the conclusion that the rate is based on cost.

All parties to this controversy agree that the rates must be based on cost. This principle is expounded in the preamble to the FERC regulations which state that:

Section 210(c) of PURPA provides that the rules requiring utilities to sell electric energy to

---

[7] Petitioners also list a third ground for appeal in their summary of the argument. *i.e.*, that the Commission erred by failing to state in its findings or conclusions the rationale supporting its decision. Because Petitioners failed to include this argument in their Statement of the Questions Involved, we will not consider it. "This rule is to be considered in the highest degree mandatory, admitting of no exception; ordinarily no point will be considered which is not set forth in the statement of questions involved or suggested thereby." Pa. R.A.P. 2116(a). *Department of General Services v. Weinberger Co., Inc.*, 65 Pa. Commonwealth Ct. 201, 441 A.2d 1341 (1982).

> qualifying facilities shall ensure that the rates for such sales are just and reasonable, in the public interest, and nondiscriminatory with respect to qualifying cogenerators or small power producers. This section contemplates formulation of rates on the basis of *traditional ratemaking (i.e., cost-of-service) concepts.*

45 Fed. Reg. 12228 (February 25, 1980) (emphasis added).

Petitioners' argument that the rate is not cost-based may be summarized as follows: Relying on the ALJ's finding that cogenerators' use of back-up power places little demand on the PECO system at peak, Petitioners state that there was no substantial evidence that the cogenerators contributed to increased capacity costs. Petitioners thus maintain that the major cost which PECO would incur through supplying firm back-up power would be the per kW energy cost, and that the ALJ's charge per kW consumed would cover the energy cost (as well as incidental capacity costs). Petitioners argue that the Commission allows the utility to recover the same costs twice, once through the actual usage charge which Petitioners claim fully compensates the utility, and then a second time through the monthly minimum demand charge. Petitioners also contend that low-volume consumers (whom Petitioners suggest efficiently produce through their own cogeneration facilities the bulk of the power which they consume) will be forced to absorb an inordinate amount of the capacity cost and that this will discourage the production of energy through cogeneration.

Thus, Petitioners allege that because of the lack of evidence that firm back-up power contributes to increased capacity, and because the rate allows PECO to charge in excess of its capacity costs, the Commission has failed to set rates on a cost-of-service basis and has thereby violated federal and state regulations governing

the supply of energy to cogenerators. Brief for Petitioners at 16-22.

The Commission, in turn, reasons that it is likely that over time a cogenerator will contribute to the need for *some* increase in capacity. The Commission acknowledges that firm back-up service for QFs imposes fewer cost increases than does service to other low usage customers, but the Commission asserts that firm back-up service requires more capacity than would service of interruptible back-up power. The Commission further acknowledges that it would be virtually impossible to determine the precise capacity cost for which a QF with an extremely low actual demand would be accountable. However, the Commission notes that the inherent difficulty with the pricing mechanism in the Recommended Decision is that a very low-usage QF makes virtually no contribution to system capacity costs, and that if *all* firm back-up usage is low, then PECO may not recover even the extremely limited capacity costs caused by firm back-up demand. Brief for Respondent, at 17-19, 21.

The Commission further asserts that its resolution of the above dilemma was supported by substantial evidence. It points to the testimony of Occidental's witness, James A. Ross (Ross). He proposed a rate mechanism which is similar, although not identical, to that which the Commission ultimately adopted. His proposal would combine a minimim charge for customers with extremely low actual usage, and a prorated rate for customers whose usage exceeded the monthly minimum demand charge:

> Under my proposed [sic] for back-up service, a customer would be obligated to pay PECO a minimum monthly payment directly related to the cost of PECO-owned production and transmission plant. When back-up service is actually taken by a cogenerator, the charges paid to

PECO would be based on a proration of the service rate which would otherwise be applicable.

. . . .

Another important feature is that, while other ratepayers are protected from subsidizing a back-up power customer, this customer would never pay more than the rate this Commission has deemed appropriate for a regular firm customer of PECO.

. . . .

. . . [The $3.35 per kW demand charge] represents the monthly cost associated with the reserve component of PECO's production and transmission plant.

. . . .

. . . The $33,500 [based on a demand for 10,000 kW of firm back-up service at a charge of $3.35 per kW] represents a minimum monthly payment and is not an additional charge. For example, in a month when the charge for actual service taken was $20,000, a customer would pay $33,500. However, in a month when the actual charges were $46,000, the customer would pay $46,000.

Testimony of Ross, R.R. at 30a, 1b-3b.

We agree that Ross's testimony supports the Commission's decision. In his testimony he calculated the energy and capacity costs which PECO incurs as a result of providing firm back-up service and he undercuts Petitioners' argument that the Commissions' rate mechanism allows for double recovery. The major difference between Ross's plan and that of the Commission is the fact that Ross would have prorated the monthly usage cost, whereas the Commission established a flat rate. Although the Commission's choice of the flat rate per kW charges may result in a higher rate for very low-lev-

el users than would the prorated rate, this difference does not negate the fact that the Commission's rate mechanism was cost-based and was supported by substantial evidence. "The establishment of a rate structure in an administrative function that is peculiarly within the Commission's expertise. . . . Whether rates are reasonable is a factual question for the Commission, which we will not disturb if it is supported by competent evidence. *Barasch v. Pennsylvania Public Utility Commission,* 101 Pa. Commonwealth Ct. 76, 86, 515 A.2d 651, 656 (1986). The Commission properly exercised its discretion by weighing the evidence and formulating a rate which is an amalgamation of the Ross proposal and the ALJ's recommendation. Clearly, because the rate was cost-based, there is no merit to Petitioners' contention that the rate violates federal and state law. Furthermore, contrary to Petitioners' contention that the rate mechanism discourages the production of cogenerated energy, the rate simply requires cogenerators to pay the cost which is attributable to the production of firm back-up power, rather than requiring consumers of other types of power to subsidize firm back-up service.

We affirm.

## ORDER

Now, this 21st day of September, 1988, the Order of the Pennsylvania Public Utility Commission in this matter, adopted July 24, 1986, and entered October 9, 1986, is affirmed.