NOT DESIGNATED FOR PUBLICATION

No. 120,436

IN THE COURT OF APPEALS OF THE STATE OF KANSAS

IN THE MATTER OF THE JOINT APPLICATION OF
WESTAR ENERGY, INC. and KANSAS GAS AND ELECTRIC
COMPANY.

MEMORANDUM OPINION

Appeal from Kansas Corporation Commission. Opinion filed April 12, 2019. Affirmed.

*David Bender*, of Earthjustice, of Madison, Wisconsin, *Robert V. Eye*, of Robert V. Eye Law Office, LLC, of Lawrence, and *Sunil Bector*, of Sierra Club, of Oakland, California, for petitioners/appellants Sierra Club and Vote Solar.

*Martin J. Bregman*, of Bregman Law Office, L.L.C., of Lawrence, and *Cathryn J. Dinges*, of Westar Energy, Inc., for respondents/appellees Westar Energy, Inc. and Kansas Gas and Electric Company.

*Michael J. Duenes*, assistant general counsel, for appellee Kansas Corporation Commission.

Before MALONE, P.J., HILL and ATCHESON, JJ.

PER CURIAM: Sierra Club, Vote Solar, and Climate and Energy Project (collectively "Sierra Club") appeal the Kansas Corporation Commission's decision to approve the non-unanimous stipulation and agreement (settlement agreement) resolving the rate application of Westar Energy, Inc. and Kansas Gas and Electric Company (collectively "Westar"). As part of the settlement agreement, Westar implemented a new three-part rate structure for a class of residential consumers who generate some of their own electricity needs—the Residential Distributed Generation (RS-DG) class— consisting of a basic service fee, an energy charge, and a demand charge. Sierra Club

1

argues that the imposition of a different rate design for the RS-DG class is discriminatory and thus violates state and federal law.

But K.S.A. 66-1265(e), enacted in 2014, expressly gives Westar the option to propose rates for "customer-generators"—which includes customers using a renewable energy resource—based on different rate structures than those applied to other customers. And here there was substantial competent evidence supporting the Commission's finding that the three-part rate design for the RS-DG class was based on a neutral cost-based rationale. So based on the evidence, we conclude that Westar has not discriminated against the RS-DG class in violation of state and federal law, and, applying our standard of review, we have no basis to set aside the Commission's decision.

FACTUAL AND PROCEDURAL BACKGROUND

*Growth of residential self-generation in Kansas and the effect on rate calculation*

As in many states, Kansas has seen a growth in the use of renewable energy resources to self-generate electricity. For residential customers who self-generate electricity, however, the largest subclass is customers who use photovoltaic (or solar) cells or panels. The record does not establish when residential use of solar power began in Kansas, but the use of solar power in Kansas significantly increased in 2015. Before 2015, Westar reported 350 consumers who were self-generating electricity. The class size increased to about 790 customers by the time of the evidentiary hearing in this case. Westar predicted the number of customers who would rely on solar power to self-generate some of their electricity demands would increase at an annual rate of roughly 72 percent. Still, the class of consumers who self-generate electricity remains small when compared to the overall number of residential customers served by Westar.

2

A utility's production and distribution of electricity incurs three types of costs: energy-related costs (the cost of producing the electricity), demand-related costs (the costs associated with meeting the peak demands for the electricity), and customer-related costs (the costs of distributing the electricity to a consumer and the service costs). Most of the costs incurred by Westar to provide electricity for residential customers are fixed costs. Only the costs related to the generation of electricity and a few operations and maintenance (O&M) costs decrease or increase directly related to energy consumption. The costs of maintaining distribution lines and meters for customers and the costs of providing service and billing personnel to meet the needs of the customers do not change relative to the amount of energy consumed.

Traditionally, Westar has recovered the costs of providing electricity through a two-part rate involving a flat service charge and a variable energy charge based on the number of kilowatt hours (kWh) used in a monthly billing period. Westar recovers only 18.25 percent of its revenue requirement allocated to the residential class through fixed charges. The variable charge is established to collect the energy costs plus a substantial portion of the utility's fixed costs. A utility company could apportion its fixed costs among its customers at a flat rate and limit the variable rate to the recovery of actual generation costs, but utilities have traditionally sought to recover fixed costs through the variable rate as an incentive for customers to exercise prudent energy consumption.

A "partial requirements customer" is a utility customer who provides some of his or her electricity needs through self-generation but cannot generate enough to be self-reliant. When such a customer is billed under a traditional two-part rate, the utility fails to recover some of its fixed costs in two ways. First, the utility loses some of its fixed costs through the customer's reduced consumption of energy. A partial consumer generates a portion of the electricity it needs but taps into the utility's grid to meet its higher consumption needs. So the self-generator is contributing to the utility's fixed generation, transmission, distribution, demand, and customer service costs. But since a portion of the

3

utility's fixed costs are recovered through the variable kWh charge, a partial consumer purchases fewer kilowatt hours from the utility at the variable rate, and the utility fails to recover as much of its fixed costs.

Second, under a net metering contract, the utility potentially loses recovery of all of its fixed costs for energy consumed by a self-generator that has exported an equivalent amount of energy to the electric grid. In a net metering arrangement, a self-generator who produces more energy than he or she needs and exports it to the grid obtains a kWh credit on his or her meter for each kWh "sold" to the utility, i.e., the meter runs backward. Since the kWh variable charge includes some of those fixed costs, the energy credit to the self-generator deprives the utility of those fixed costs for each kWh consumed by a self-generator but offset by a similar number of kWh exported by the self-generator.

In March 2016, KCC Staff filed a motion with the Commission to open an investigation into rate design for RS-DG customers. The Commission issued an order opening the investigation on July 12, 2016. The Alliance for Solar Choice and the Climate and Energy Project were permitted to intervene in the proceedings.

We will not set forth the Commission's findings from the investigation in detail. But in summary, the Commission established that a separate rate class was permissible for RS-DG customers (such as those with solar power), but that the reasonableness of the specific rate structure would depend on evidence provided through a class cost of service study or other evidence justifying the actual rates imposed.

*Procedural history of this case*

During 2016-2017, Westar conducted a RS-DG class cost of service study and, on February 1, 2018, filed a petition with the Commission for approval of a utility rate change. Westar sought a two-step rate change for a net rate increase of $52.6 million.

4

Pertinent to this appeal, Westar also sought to implement a three-part rate design for RS-DG customers. The Commission suspended the proceedings for 240 days.

Many parties sought to intervene in the case, but, for purposes of this appeal, the important intervenors were Sierra Club, Vote Solar, and Climate and Energy Project. The Commission permitted the interventions but consolidated the three parties because they were united in interest.

On May 24, 2018, the Commission approved the merger of Westar and Great Plains Energy. In the settlement paving the way for the Commission's approval of the merger, Westar made certain agreements that affected the revenue requirements in this rate proceeding.

After many of the parties submitted prefiled direct testimony in support of their various positions on Westar's rate application, several parties entered settlement negotiations, ultimately arriving at a "black box settlement." The non-unanimous stipulation and agreement considered the merger settlement and provided for a revenue reduction of roughly $66 million, offset by a $15.7 million property tax surcharge, for a net revenue reduction of about $50.3 million.

As for rate design, the parties to the settlement agreement agreed to maintain the existing monthly basic service fee ($14.50) for all residential classes. Westar had introduced two new optional tariffs for standard residential customers—Residential Peak Efficiency Rate (RPER) and Residential Electric Vehicle (REV)—that implement the same rate as the RS-DG class, i.e., a three-part rate with a $14.50/basic service charge, a per kWh charge, and a demand charge of $3.00 in the winter and $9.00 in the summer. The settlement agreement maintained the optional nature of the RPER and REV rate designs. Under these optional plans, customers who voluntarily switch to either the RPER or REV rate designs may opt out of the program within a year and return to the default

5

rate for standard residential customers. In contrast, the proposed rate design for the RS-DG class was not optional but mandatory.

The rate design for the four pertinent classes [residential standard (RS), residential standard distributed generation (RS-DG), residential peak efficiency (RPER), and residential electric vehicle (REV)], as proposed within the settlement agreement, are illustrated in the table below:

| Class | Basic Service Fee | Energy Charge ($/kWh) | | Demand Charge | |
|-------|-------------------|-----------------------|--|---------------|--|
| RS | $14.50 | Winter Block 1 | $0.073512 | N/A | |
| | | Winter Block 2 | $0.073512 | | |
| | | Winter Block 3 | $0.060089 | | |
| | | Summer Block 1 | $0.073512 | | |
| | | Summer Block 2 | $0.073512 | | |
| | | Summer Block 3 | $0.081088 | | |
| RS-DG | $14.50 | $0.045840 | | Winter | $3.00 |
| | | | | Summer | $9.00 |
| RPER | $14.50 | $0.045840 | | Winter | $3.00 |
| | | | | Summer | $9.00 |
| REV | $14.50 | $0.045840 | | Winter | $3.00 |
| | | | | Summer | $9.00 |

As part of the settlement agreement, Westar also agreed to submit an annual report to the KCC Staff and to the Citizens' Utility Ratepayer Board (CURB), identifying the number of RS-DG customers, the demand charge and energy charges during the year, an analysis of customers' change in energy consumption, and a report of the impact upon each RS-DG customer.

Sierra Club objected to the settlement agreement, challenging the perceived discriminatory effect of the new rate design for RS-DG customers and the efficiency of Westar's continued use of coal-based generation plants. After receiving prefiled

testimony in support of, and in opposition to, the proposed settlement agreement, the Commission held a two-day hearing on July 24-25, 2018. The parties submitted prefiled testimony from their own witnesses, who were then subject to cross-examination. Instead of closing arguments, the parties submitted written briefs arguing their various positions on the settlement agreement.

On September 27, 2018, the Commission issued an order approving the non-unanimous settlement agreement. Sierra Club filed a petition for reconsideration. Kansas Industrial Consumers Group, Inc. (KIC), Westar, and the KCC Staff filed responses to the petition for reconsideration. Sierra Club filed a reply.

On November 8, 2018, the Commission issued its order denying the petition for reconsideration. Sierra Club filed a petition for judicial review on December 13, 2018. While the petition appeared untimely, this court issued an order accepting the petition because of an inadvertent rejection of an earlier and timely electronic filing.

*Claims on appeal and standard of review*

Sierra Club makes three claims on appeal. First, Sierra Club claims that the "higher overall rates and charges for solar customers than they would pay under the rates for non-solar customers violates K.S.A. 66-117d." Second, Sierra Club claims that "[m]aking an unknown and more complicated 'demand' charge mandatory for solar customers and optional for other customers constitutes a prejudice or disadvantage in violation of K.S.A. 66-117d." Third, Sierra Club claims that the "different rates for solar customers discriminate compared to rates for sales to other customers, in violation of 18 C.F.R. § 292.305, because they are not justified by systemwide costing principles applied without regard to whether a customer generates."

In response, Westar asserts that the rates and charges RS-DG customers pay for utility-supplied electricity do not violate the provisions of K.S.A. 66-117d. Westar maintains that implementing a mandatory rate for RS-DG customers that includes a demand charge while not implementing such a mandatory rate for RS customers does not subject RS-DG customers to any prejudice or disadvantage because of the use of any such renewable energy source. Finally, Westar contends that the difference between the RS-DG rate and the RS rate is consistent with the language of 18 C.F.R. § 292.305 (2017).

The Commission asserts that it correctly approved the RS-DG rate as nondiscriminatory because the rate is based on the RS-DG customers' status as partial requirements customers who have distinct electricity usage patterns. The Commission also contends that its finding that RS-DG customers are not prejudiced or disadvantaged by the RS-DG rate is reasonable and supported by substantial competent evidence. Finally, the Commission asserts that its finding that the RS-DG rate is just and reasonable comports with federal law.

Sierra Club properly filed its petition for judicial review with this court instead of the district court. See K.S.A. 66-118a(b). The Kansas Judicial Review Act, K.S.A. 77-601 et seq., governs judicial review of the Commission's decision. K.S.A. 66-118c. The party asserting the invalidity of the Commission's decision, here Sierra Club, bears the burden of establishing error. K.S.A. 2018 Supp. 77-621(a)(1); *In re Equalization Appeal of Wagner*, 304 Kan. 587, 597, 372 P.3d 1226 (2016); *Kansas City Power & Light v. Kansas Corporation Comm'n*, 52 Kan. App. 2d 514, 520, 371 P.3d 923 (2016).

Appeals from the Commission's approval or establishment of utility rates differ from the typical administrative appeals, and the Commission's unique role affects the scope of appellate review. Public utility rate making is essentially a legislative function, delegated to the Commission by the Kansas Legislature. When acting under its authority

8

to supervise, control, and regulate a public utility, the Commission is not acting as a quasi-judicial body, but it is acting as a quasi-legislative one. *Kansas Gas & Electric Co. v. Kansas Corporation Comm'n*, 239 Kan. 483, 491, 720 P.2d 1063 (1986). The Commission thus has broad authority to determine just and reasonable rates. K.S.A. 66-101b; *Kansas Gas & Electric Co.*, 239 Kan. at 496-97. The fact that a rate stems from an approved non-unanimous settlement agreement does not diminish this authority. See *Mobil Oil Corp. v. FPC*, 417 U.S. 283, 312-14, 94 S. Ct. 2328, 41 L. Ed. 2d 72 (1974); *Farmland Industries, Inc. v. Kansas Corporation Comm'n*, 24 Kan. App. 2d 172, 186-87, 943 P.2d 470 (1997).

To the extent the issues raised in this appeal involve statutory interpretation or application, the Commission is not entitled to any deference. *Mera-Hernandez v. U.S.D. 233*, 305 Kan. 1182, 1185, 390 P.3d 875 (2017). But where the resolution of the issues hinge on fact determinations, the Commission is entitled to significant deference. A court may reverse the Commission's fact determination but only when the determination "is not supported to the appropriate standard of proof by evidence that is substantial when viewed in light of the record as a whole." K.S.A. 2018 Supp. 77-621(c)(7). Although the court reviews the evidence in the record as a whole, it does not infringe upon the Commission's authority to weigh conflicting evidence or judge the credibility of witnesses. See K.S.A. 2018 Supp. 77-621(d); *Mobil Exploration & Producing U.S. Inc. v. Kansas Corporation Comm'n*, 258 Kan. 796, 815, 908 P.2d 1276 (1995).

DOES THE RATE DESIGN FOR THE RS-DG CLASS VIOLATE KANSAS LAW?

Sierra Club first claims that the imposition of the three-part rate design on the RS-DG consumer class constitutes improper discrimination in violation of Kansas law. Sierra Club frames the issue as one of statutory interpretation, arguing that the plain language of K.S.A. 66-117d prohibits the Commission from approving a different rate for the RS-DG consumer class than applied to the standard residential class. Sierra Club argues that the

new rate is discriminatory in violation of K.S.A. 66-117d because (a) it imposes higher charges on RS-DG customers than on standard residential customers, and (b) because the new rate is harder to understand and apply, prejudicing members of the RS-DG class.

K.S.A. 66-117d states:

> "No electric or gas utility providing electricity or gas service in this state shall consider the use of any renewable energy source other than nuclear by a customer as a basis for establishing higher rates or charges for any service or commodity sold to such customer nor shall any such utility subject any customer utilizing any renewable energy source other than nuclear to any other prejudice or disadvantage on account of the use of any such renewable energy source."

Sierra Club contends that the only distinguishing characteristic of the RS-DG class is the customers' use of renewable energy to supply some of their demand for electricity. As a result, Sierra Club argues that the rate structure discriminates against customers using renewal energy sources in violation of K.S.A. 66-117d. The KCC contends that the use of renewable energy is not the determining factor for inclusion in the class. Instead, the KCC argues that RS-DG customers pay a different rate in compliance with K.S.A. 66-117d because they are partial requirements customers with distinct electricity usage patterns. Westar takes a different approach, arguing that the different charges for RS-DG customers is expressly authorized by Kansas law under K.S.A. 66-1265(e).

As the evidence presented here shows, users of renewable energy, mainly solar power, constitute the entire RS-DG class. As a result, we find that the KCC's attempt to distinguish between customers using renewable energy sources and "partial requirements customers" is disingenuous. If K.S.A. 66-117d—enacted in 1980—was the only law on the books on this subject, we might find merit in Sierra Club's claim that the imposition of the separate rate design on the RS-DG consumer class constitutes improper discrimination in violation of Kansas law.

But as Westar points out, in 2014—34 years after the Kansas Legislature adopted K.S.A. 66-117d—the Legislature amended the Net Metering and Easy Connection Act, K.S.A. 66-1263 et seq., initially enacted in 2009. For customer-generators who began using renewable energy on or after July 1, 2014, K.S.A. 66-1265(e) now provides:

> "(e) for any customer-generator which began operating its renewable energy resource under an interconnect agreement with the utility on or after July 1, 2014, have the option to propose, within an appropriate rate proceeding, the application of time-of-use rates, minimum bills or other rate structures that would apply to all such customer-generators prospectively."

Thus, in 2014, the Kansas Legislature adopted legislation giving utilities the option to propose rates for "customer-generators"—which by definition includes customers using a renewable energy resource—based on different rate structures than those applied to other customers. See K.S.A. 66-1264(b)(1) (defining "customer-generator" as the "owner or operator of a net metered facility which . . . [i]s powered by a renewable energy resource"). K.S.A. 66-1265(d) basically serves as a "grandfather clause" for any customer-generator who began using renewable energy before July 1, 2014.

Interpretation of a statute is a question of law over which appellate courts have unlimited review. See *Hoesli v. Triplett, Inc.*, 303 Kan. 358, 362, 361 P.3d 504 (2015). The most fundamental rule of statutory construction is that the intent of the Legislature governs if that intent can be ascertained. 303 Kan. at 362. An appellate court must first attempt to ascertain legislative intent through the statutory language enacted, giving common words their ordinary meanings. *Ullery v. Othick*, 304 Kan. 405, 409, 372 P.3d 1135 (2016). When a statute is plain and unambiguous, an appellate court should not speculate about the legislative intent behind that clear language, and it should refrain from reading something into the statute that is not readily found therein. 304 Kan. at 409.

11

Based on the plain language of the two statutes, we find it almost impossible to reconcile the conflicting provisions of K.S.A. 66-117d and K.S.A. 66-1265(e). The two statutes seem to be saying the opposite. But the Kansas Legislature was presumably aware of K.S.A. 66-117d when it enacted K.S.A. 66-1265(e). See *Ed DeWitte Ins. Agency v. Financial Assocs. Midwest*, 308 Kan. 1065, 1071, 427 P.3d 25 (2018). "When there is a conflict between two statutes the latest legislative expression generally controls. But when the conflict is between a general principle of law and a more specific enactment, the more specific statute controls." *State v. Englund*, 50 Kan. App. 2d 123, Syl. ¶ 3, 329 P.3d 502 (2014).

K.S.A. 66-1265(e) controls the issue presented here. It is both the latest pronouncement of the Legislature on rates for customer-generators and addresses the specific issue of rate design, while K.S.A. 66-117d is both an earlier enactment and addresses rates more generally. The language of K.S.A. 66-1265(e) expressly applies to customer-generators who began using renewable energy on or after July 1, 2014, and the Kansas Legislature authorized utilities to design a rate structure specific to this class of customer-generators, even though the rates might otherwise violate K.S.A. 66-117d. As a result, Sierra Club's arguments regarding the higher charges on RS-DG customers and the prejudice caused by the difficulty in understanding the rate become immaterial.

Under the authority provided by K.S.A. 66-1265(e), the only restraint on the utility's rate design for RS-DG customers is the restraint generally imposed on rates, which is that they cannot be discriminatory. In the context of rate design, this generally means that the rate design is reasonably calculated to recover the costs of providing service to a particular class plus a reasonable return. In other words, a rate design is generally not discriminatory if it is cost-based. See *Mitchell v. City of Wichita*, 270 Kan. 56, 62, 12 P.3d 402 (2000) ("Rates must be reasonable in the sense that they are not excessive or confiscatory."); *Jones v. Kansas Gas and Electric Co.*, 222 Kan. 390, 401,

12

565 P.2d 597 (1977) ("The touchstone of public utility law is the rule that one class of consumers shall not be burdened with costs created by another class.").

Although the parties presented conflicting evidence on the reasonableness of the new RS-DG rate design, there was substantial competent evidence supporting the Commission's finding that the new rate design was based on a neutral cost-based rationale. Westar's witness, Ahmad Faruqui, explained that the expected higher billing was to recover fixed costs that RS-DG customers previously avoided by reducing their consumption. Both Faruqui and KCC Staff witness, Robert Glass, indicated that the new rate structure would not impose greater costs on RS-DG customers as a class because the RS-DG customer rate design was revenue neutral as to the class. Faruqui testified:

> "Westar's proposed three-part rate design is revenue neutral. In other words, in the absence of any change in customer load shapes, the three-part rate would collect the same revenue as a two-part rate that is based on the DG customer-specific revenue requirement. Some customer bills will increase by less than the class average as a result of the change in rate design, and some will increase by more. On average, the rate design change will not lead to a change in revenues (*i.e.*, average rates)."

Madeline Yozwiak, on behalf of Sierra Club, objected to the proposed three-part rate design change for the RS-DG class. She contended that the proposed rate was disproportionate to the rate changes proposed for other residential customers and argued that the rate change was unjustified because RS-DG customers were paying a larger proportional share of Westar's costs than other customers. In support of her conclusion, Yozwiak stated that she calculated the average monthly increase for the RS-DG class as compared to the standard residential class, using the billing determinants from Westar's submissions and Westar's proof of revenue analysis.

During the hearing on the motion to approve the settlement agreement, Glass provided the most detailed testimony on the calculation of the rates imposed on the RS-

13

DG class as a result of the settlement agreement. We need not summarize Glass' detailed testimony in this opinion. But based on Glass' calculation of the rates imposed on the RS-DG class, including the demand charge implemented in the three-part rate design, he found that the new rate imposed on the RS-DG class is reasonably related to how the customers in that class use the utility without disproportionately burdening the RS-DG class in favor of the standard residential class. On whether the three-part rate design was just and reasonable to members of the RS-DG class, Glass concluded that "their rate structure is going to fit their behavior, their unique behavior, better than the current rate structure. So I would argue that the rates, if not just and reasonable, are more just and reasonable than they were" under the prior rate structure.

In this proceeding, the Commission specifically adopted the testimony of Faruqui and Glass in support of the proposed rate design for the RS-DG class. The Commission need not render its findings with minute specificity, so long as the explanation is specific enough to permit judicial review of the reasonableness of its order. *Zinke & Trumbo, Ltd. v. Kansas Corporation Comm'n*, 242 Kan. 470, 475, 749 P.2d 21 (1988). As we understand the argument, Sierra Club does not challenge the evidence supporting a three-part rate design but contends that any rate design that differs from the rate imposed on the standard residential class violates K.S.A. 66-117d. Nevertheless, substantial competent evidence in the record supports the Commission's approval of the new RS-DG rate design based on actual (if averaged) costs to the utility. Because the rate design bears a rational relationship to the utility's cost recovery and does not impose a disproportionate burden on the RS-DG class, the new rate is not discriminatory simply because it imposes higher charges on the RS-DG class than they would receive under the standard residential rate.

DOES THE RATE DESIGN FOR THE RS-DG CLASS VIOLATE FEDERAL LAW?

Alternatively, Sierra Club contends that the new rate design for the RS-DG class violates 18 C.F.R. § 292.305. The Federal Energy Regulatory Commission (FERC)

14

implemented regulations to effect the congressional mandate within the Public Utility Regulatory Policies Act of 1978. The purpose of the Act, in turn, was to encourage the development of cogeneration facilities and small power production facilities. See *American Paper Inst. v. American Elec. Power Serv. Corp.,* 461 U.S. 402, 404-05, 103 S. Ct. 1921, 76 L. Ed. 2d 22 (1983). To encourage this development, Congress directed FERC to pass regulations governing the sale of and purchase from a qualified facility by a traditional, regulated utility. 18 C.F.R. § 292.305(a) provides:

> "(a) General rules.
>
>> (1) Rates for sales:
>>
>>> (i) Shall be just and reasonable and in the public interest; and
>>>
>>> (ii) Shall not discriminate against any qualifying facility in comparison to rates for sales to other customers served by the electric utility.
>>
>> (2) Rates for sales which are based on accurate data and consistent systemwide costing principles shall not be considered to discriminate against any qualifying facility to the extent that such rates apply to the utility's other customers with similar load or other cost-related characteristics."

"Qualifying facility" is defined as "a cogeneration facility or a small power production facility that is a qualifying facility under Subpart B of this part." 18 C.F.R. § 292.101(b)(1) (2017). Residences with solar panels constitute cogeneration facilities because they meet the requirements of 18 C.F.R. §§ 292.205(a), (b), and (d) (2017) and do not require a notice of self-certification because they possess a net power production of less than 1 megawatt (MW) or 1,000,000 watts of electricity. 18 C.F.R. §§ 292.203(b) and (d)(1) (2017).

The rates imposed by a traditional utility on a qualifying facility must be "just and reasonable." 18 C.F.R. § 292.305(a)(1)(i). Those terms are accorded their traditional meaning within the rate-making context. See *American Paper Institute*, *Inc.*, 461 U.S. at 415. 18 C.F.R. § 292.305(a)(2) defines discriminatory practices under the regulation and

excludes rates based on systemwide costing principles and accurate data related to relative load and other "cost-related characteristics." In this context, the present proceeding is distinguishable from *Swecker v. Midland Power Cooperative*, Docket No. FCU-99-3, 2000 WL 477524 (Iowa U.B. 2000). In *Swecker*, the different rate structures were not cost-based because, before implementing the rate structures, the utility had no co-generators in the customer class. The difference in rates was based on the cost data applicable to three-phase class customers who were not co-generators and on assumptions about co-generators' use of energy. 2000 WL 477524 at Section B.

In contrast, the proposed rate design presented by Westar was based on a cost study of the RS-DG class. The study was taken from a small sample (because only a few customers were initially in the class) and projected on the class as a whole. This practice was reasonable given the exponential growth of the class in the test year and the comparative similarities to the class members' use of electricity. Westar's study showed that revenue received from the RS-DG class was not covering the costs of service to that class. While the rates approved by the Commission in the settlement agreement were different from those prepared by Westar, the approved rates were more favorable to the class than Westar's proposed rates. As shown before, Sierra Club cannot establish that the approved rates prejudiced the RS-DG class.

Sierra Club's reliance on *In the Matter of the Proposed Adoption of Rules of the Minnesota Public Utilities Commission Governing Cogeneration and Small Power Production*, Docket No. E-999, 1983 WL 908113, at *63-64 (Minn. P.U.C. 1983), is similarly misplaced. The Minnesota Commission was concerned with rules about payment to qualifying facilities for energy provided to a regulated utility. See 1983 WL 908113, at *63. In conducting its inquiry under Minn. Stat. § 216B.164.3, the Minnesota utility commission balanced the utility's need to recover its fixed distribution costs and the qualifying facility's interest in not suffering discrimination. The commission acknowledged that, if it set the price of energy from the qualifying facility at the per

16

kilowatt hour charge used by the utility—essentially off-setting the charges the utility required from the qualifying facility—it would not provide the utility with its demand charges encompassed within the energy charge. See 1983 WL 908113, at *64.

In essence, the Minnesota utility commission made a policy decision that, in assessing the rates by which qualifying facilities would be paid for energy provided to the utility, the rate should be based on the lowest avoided cost of the utility. 1983 WL 908113, at *64. While the reasoning of the Minnesota utility commission provides persuasive authority for Sierra Club's position, nothing in the decision suggests that an alternative decision by the commission, accounting for the demand charge within the energy charge, would have been declared discriminatory. In short, the Minnesota utility commission made a policy decision about the rules governing rates based on the governing law. The fact that it made a policy decision in favor of the qualifying facilities does not mean that a contrary decision would constitute improper discrimination under 18 C.F.R. § 292.305(a) if the decision were properly based on appropriate cost principles.

As discussed, the new RS-DG rate structure implemented in this proceeding was designed to impose more of the demand costs incurred by the RS-DG customers that were unrecovered through an energy charge based on the RS-DG customer's lower usage. Because the rate design properly recovers costs to the utility based on the RS-DG class' unique load and demand requirements, it does not violate 18 C.F.R. § 292.305(a)(1)(ii). See *Albert Einstein Healthcare Foundation/University of Pennsylvania v. Pennsylvania Public Utility Comm'n*, 119 Pa. Commw. 608, 619, 548 A.2d 339 (1988) ("[B]ecause the rate was cost-based, there is no merit to Petitioners' contention that the rate violates federal and state law.").

Finally, contrary to Sierra Club's argument, systemwide costing principles do not require the Commission to apply similar rate designs to standard residential customers who use lower amounts of energy than the class average and thus potentially cause the

utility to under-recover its costs through a rate design that embeds the demand charge in the energy charge. This argument would require the utility to consider each individual customer's use characteristics rather than identifying a class based on use characteristics and designing a rate to recover the class costs. It is not feasible to create a rate structure governing each individual consumer's use of utility-provided energy. The rate design must be based on the average characteristics of the class. And as discussed, standard residential customers use Wester's electric grid differently than the RS-DG customers.

Anomalies in patterns of electricity use may likely be found in both the standard residential class and in the RS-DG class. But with respect to the typical standard residential consumer who uses less than average energy, that customer's demand on the system is also lessened. This is not the case for the typical RS-DG customer, whose demand on the system is usually equivalent to the standard residential customer while his or her energy consumption is lessened by self-generation of electricity. These differences justify applying the new demand-based rate design to the RS-DG class without applying the same mandatory rate to low-energy consumers within the standard residential class.

In sum, the rate design approved by the Commission for the RS-DG class does not violate federal law. The Commission received substantial competent evidence supporting its conclusion that the three-part rate design for the RS-DG class is just and reasonable based on unique usage patterns of members of the RS-DG class and based on costs incurred by the utilities to provide service to the class. Applying our standard of review, we have no basis to set aside the Commission's decision.

Affirmed.